## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| E.D., a minor, by MARYANN DOTEGOWSKI, individually as parent and next friend of E.D., | ) ) ) ) ) | Case No. 16-CV-432-NJR-SCW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ABBOTT LABORATORIES INC., | ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) ) | |

## PLAINTIFF'S OMNIBUS MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF CERTAIN SUBJECTS AT TRIAL AND ABBOTT'S RESPONSES

Pursuant to the Court's October 5, 2017 Order (Case No. 3:13-cv-52, Dkt. 1107), Plaintiff Emily Dotegowski[1] files this combined omnibus motion *in limine* to request that the Court exclude the introduction of any evidence, references, inferences, testimony, documents, or arguments whether at *voir dire* or during trial relating to the topics set forth below. Abbott's responses follow each of Plaintiff E.D.'s motions.

## I.    LEGAL STANDARD

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.  Even if evidence is arguably relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403.

---

[1] At the time of filing Emily Dotegowski was a minor. She reached the age of majority on in 2016 and thus will be referred to by name in this pleading.

It is well established that "certain circumstances call for the exclusion of evidence which is of unquestioned relevance" because the evidence may risk everything from "inducing decision on a purely emotional basis" to "merely wasting time."  Fed. R. Evid. 403 Adv. Comm. N. "Evidence that takes time to present and digest but contributes little to the jurors' understanding of the real issues in the case is a kind of noise, obstructing rather than advancing understanding." *U.S. v. Seals*, 419 F.3d 600, 613 (7th Cir. 2005).  Such evidence "should be kept out."  *Id.*

"It is highly desirable that the trial judge rule on motions *in limine* well before trial so that the parties can shape their trial preparations in light of his rulings without having to make elaborate contingency plans."  *Pena v. Leombruni*, 200 F.3d 1031, 1034–35 (7th Cir. 1999) (citations omitted).

Pursuant to Federal Rules of Evidence 401 and 402, Plaintiffs assert that Abbott should be precluded from offering any evidence, argument, inference, and/or documents, making inferences, or eliciting testimony concerning or regarding the topics enumerated below on the ground that such topics are irrelevant, highly prejudicial and/or improperly calculated to sway sympathies or emotions of the jury.

## II.      MOTIONS *IN LIMINE*

### Plaintiffs' MIL #1

Plaintiff Emily Dotegowski moves to exclude any comment, evidence, testimony, argument, or inference, reflecting that Plaintiff received, may be entitled to receive, or will receive, benefits of any kind or character from any housing, Medicaid, state sponsored program, or private insurance; and that any insurance has been received by Plaintiff, or that she has been entitled to receive or may receive any insurance benefits for the injuries or damages in this case. Illinois follows the collateral source rule, under which "benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages

otherwise recoverable from the tortfeasor." *Wills v. Foster*, 892 N.E.2d 1018, 1022 (Ill. 2008) (quoting *Arthur v. Catour*, 833 N.E.2d 847, 851 (Ill. 2005)). This rule has both "evidentiary and substantive components."[2] *Id.* As a substantive rule of damages, it prohibits the reduction of a plaintiff's compensatory award by any amount a plaintiff may have received from insurance proceeds. *Id.* at 1023. As a rule of evidence, "the rule prevents the jury from learning anything about collateral income." *Id.* at 1022. The rule regardless of whether the treatment is paid for by private insurance or by a governmental insurance program. *Id.* at 1029-31.

Indeed, "a plaintiff's recovery may not be reduced because a source close to the defendant, such as 'a beneficial society,' the plaintiff's family or employer, or an insurance company, paid the plaintiff's expenses." *Cates v. Wilson,* 361 S.E.2d 734, 737 (N.C. 1987). Thus, evidence "pertaining to the plaintiff's insurance is irrelevant." *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prods. Liab. Litig.*, No. 3:09-CV-10012-DRH, 2011 WL 6740391, at *42 (S.D. Ill. Dec. 22, 2011) ("*Yaz* Order"). The Court excluded this evidence in the *Raquel* trial. *See* May 16, 2017 Order on Plaintiffs' Motions *in Limine*, Dkt. No. 268 at *2-3.

## Abbott's Response to MIL #1

Abbott acknowledges that this Court has granted similar motions in other cases as they relate to collateral support that child plaintiffs have received or would receive from sources wholly independent from Abbott.  As long as the same prohibitions apply equally to Abbott and Plaintiffs, as long as those prohibitions (if any) are consistent with governing New Jersey law,[3]

---

[2] Plaintiffs contend that Illinois law should apply to issues of liability and punitive damages in this case.

[3] Although Plaintiffs' position has changed over time, it appears as if the parties might now agree that New Jersey law governs the liability and compensatory damages issues in this case.  (*See* Pls.' Opp. to Abbott's Mot. for Summ. J. (Doc. 43) at 1.)  For reasons discussed in Abbott's

and as long as those prohibitions do not limit Abbott's right to redact references to this topic if they appear in otherwise admissible documents, Abbott does not oppose Plaintiffs' Motion *in Limine* No. 1 as it relates to benefits received by Emily Dotegowski ("Emily") specifically. Abbott will not raise collateral support Emily received or would receive from sources independent from Abbott without first receiving the Court's approval.

For at least four reasons, however, the Court should not bar all evidence, testimony, arguments, and references to collateral source benefits (collectively, "collateral source evidence"). *First*, Plaintiffs may "open the door" to a certain subject, *see, e.g.*, *Miller v. Ill. Dep't of Transp.*, 2012 WL 2922690, at *2 (S.D. Ill. July 17, 2012); *In re Yasmin & Yaz*, 2011 WL 6740391, at *3, or the topic may become relevant and admissible, *see, e.g.*, *Perry v. Thomas*, 2011 WL 1600511, at *2 (S.D. Ind. Apr. 27, 2011); *Ternier v. Smith*, 2010 WL 1030461, at *5–6 (N.J. Super. Ct. App. Div. Mar. 23, 2010). The Court need not look further than *D.W.K. v. Abbott Laboratories Inc.* ("*Kaleta*") to see the error of Plaintiffs' assumption that their evidence will not open that door. During that trial, Mary Kaleta testified that D.W.K. had not received treatment from his long-term therapist because her husband had been unemployed. (*See* Ex. 1, 3/12/15 *Kaleta* Trial Tr. at 2198:9-19, 2218:7–2219:22.) Acknowledging that Ms. Kaleta's testimony created the prejudicial impression that D.W.K. would be without crucial treatment without a damages award from Abbott, this Court ruled that Abbott was "entitled" to question Ms. Kaleta about "what she's done to investigate different programs" and denied the plaintiffs' objection based on the collateral source doctrine. (*Id.* at 2211:6–2212:24.)

If Plaintiffs open the door in a similar manner by suggesting that Emily has unmet needs for medical or other treatment, the Court should allow Abbott to respond by discussing and

---

Motion for Summary Judgment (Doc. 25), New Jersey law should govern all of Plaintiffs' claims.

presenting evidence concerning collateral benefits.  Other ways in which Plaintiff could open the door to evidence of collateral source benefits include, but are not limited to: (a) any suggestion that expense prevented Maryann Dotegowski ("Mrs. Dotegowski") from receiving prenatal care or counseling from any specialists or other doctors concerning the potential birth defect risks of Depakote;[4] (b) any suggestion that expense prevented Mrs. Dotegowski from using certain types of birth control when Emily was conceived; or (c) any suggestion that Emily's condition and/or treatment caused unmanageable financial hardship for his family.

_Second_, New Jersey law requires the Court to consider collateral source evidence before entering any damages award for Emily.  *Ribeiro v. Sintra*, 2008 WL 2677536, at *2 (N.J. Super. Ct. July 10, 2008) (reversing trial court's exclusion of medical bills and remanding for damages determination based on amounts paid for plaintiff's care).  If a verdict is rendered in Plaintiffs' favor, collateral source evidence "shall be disclosed to the court and the amount thereof which duplicates any benefit contained in the award shall be deducted from any award recovered by the plaintiff."  *Id.* (quoting N.J. Stat. Ann. 2A:15-97).

> The Legislature's purpose in enacting [N.J. Stat. Ann. 2A:15-97] was "to prevent double recovery, thereby giving some relief from the increasing costs of liability insurance."  *Parker v. Esposito,* 291 *N.J.Super.* 560, 566, 677 A.2d 1159 (App. Div.), *certif. denied,* 146 *N.J.* 566, 683 A.2d 1162 (1996).   In considering the procedure to be used, "[t]he statute places no restriction on a party introducing, for the jury's consideration, evidence of the total amount of medical bills incurred."  *Dias v. A.J. Seabra's Supermarket,* 310 *N.J.Super.* 99, 102, 707 A.2d 1391 (App. Div. 1998).   The statute thus requires that the court make the adjustment "after the jury has considered the *full amount incurred.*"  *Ibid.* (emphasis added).

---

[4] *See e.g., Ferren v. Nat'l R.R. Pass. Corp.*, 2001 WL 1607586, at *2 (N.D. Ill. Dec. 12, 2001) ("courts have struck the balance in favor of allowing collateral source payment evidence . . . to cross examine a plaintiff who had testified that he had not visited a doctor again about an injury because he had fallen behind in payments of his bills") (citing *Gladden v. P. Henderson & Co.*, 385 F.2d 480, 483 (3d Cir. 1967)).

*Id.* (emphasis in original).   N.J. Stat. Ann. 2A:15-97 essentially eliminated the traditional collateral source rule to "'require that *awards* for personal injury *be reduced* by any compensating benefits which the plaintiff has received from other sources.'"   *Perreira v. Rediger*, 778 A.2d 429, 436 (N.J. 2001) (emphasis in original) (quoting *Statement by Senate Judiciary Committee* (October 30, 1986)).

Plaintiffs bear the initial burden to present collateral source evidence to the Court, if necessary, after trial.  *Thomas v. Toys R Us, Inc.*, 660 A.2d 1236, 1244 (N.J. Super. Ct. App. Div. 1995).

> Regardless of the fact that it is the defendant who benefits from the statute, and may be the first to bring this matter to the attention of the court, the Legislature made it clear that it is the plaintiff, under N.J.S.A. 2A:15-97, who must supply documents and records showing what duplicate benefits have and will be received.

*Id*.  Abbott expects that a significant number of the medical expenses that Plaintiffs seek to recover for Emily's birth defects were paid by her parents' medical insurance, which Plaintiffs have to bring to the Court's attention.  Plaintiffs also are required to identify any future benefits that "can be determined with a reasonable degree of certainty."  *Parker v. Esposito*, 677 A.2d 1159, 1162-63 (N.J. Super. App. Div. 1996) (reducing award based on amount to be paid through disability policy); *Thomas*, 660 A.2d at 1245 (same, future social security benefits).

*Third*, Plaintiffs' arguments that collateral source evidence related to Emily has no place at trial should likewise bar them from introducing it to their benefit.  For example, they cannot argue (1) about the manners in which their compensatory damages, if any, would be spent on Emily's future treatment, or (2) that Abbott made a conscious choice not to present evidence of inadmissible collateral benefits.  Given the fact that collateral benefits have been and will continue to be available for Emily, Plaintiffs may not specifically insinuate to the jury that such

future benefits are *not* available or that Abbott concedes that "every penny" of their claimed damages would be necessary to make them whole.

Argument from the recent trial in *E.R.G. v. Abbott Laboratories Inc.* ("*Raquel*") shows that, if not given proper boundaries, Plaintiffs' attorneys will do just that.  (*See, e.g.,* Ex. 2, 6/7/17 *Raquel* Trial Tr. at 1667:1-16 (arguing that "$12.9 million…every penny of [E.R.G.'s life] care plan, is designed to be paid to somebody else").)  The *Raquel* plaintiffs impermissibly used the collateral source rule as both a shield—a means to block Abbott from presenting any evidence that plaintiffs would require less than the amounts demanded for E.R.G.'s care to be made whole—and a sword—a means of convincing the jury that, because no opposing evidence had been presented in accordance with the collateral source doctrine applicable to that case, jurors could only conclude that "every penny" of the requested award was necessary for E.R.G.'s care.  (*Id.*)  Allowing Plaintiffs to follow the tactics employed in *Raquel* would mislead jurors and cause unfair prejudice to Abbott.

In the alternative, the Court should clarify that references to the manners in which Plaintiffs would spend any compensatory damages awarded for Emily's future treatment would open the door to collateral source evidence about the amounts actually needed for the treatment of any injuries that Plaintiffs attribute to Depakote, including, but not limited to, Medicaid, Social Security benefits, insurance benefits, and special needs trusts.[5]  Asserting that "every penny" sought by Plaintiffs would be necessary for Emily's future treatment would open the door to examination of collateral benefits.

---

[5] "A special-needs trust, also known as a supplemental-needs trust, is a trust created on behalf of a disabled individual under the age of 65, in order to allow the individual to retain eligibility for Medicaid while also having special or supplemental needs, not covered by Medicaid, paid for out of trust funds.  . . .  Use of such a trust is specifically authorized by a federal statute, 42 U.S.C. § 1396p(d)(4)(A)."  *Hobbs ex rel. Hobbs v. Zenderman*, 542 F. Supp. 2d 1220, 1223 n.1 (D.N.M. 2008), *aff'd*, 579 F.3d 1171 (10th Cir. 2009).

*Finally*, neither New Jersey substantive law nor Illinois procedural law prohibits collateral source evidence related to benefits available to Emily's parents.  Among other things, that evidence bears on whether Mrs. Dotegowski took Depakote when Emily's spina bifida occurred and in a dosage that could have caused that condition.

Initially, Mrs. Dotegowski testified that Dr. Eliot Kaplan (her psychiatrist) prescribed Depakote that she purchased from Pathmark Pharmacy.  (*See* Ex. 3, 8/23/12 M. Dotegowski Dep. at 25:2-26:15, 105:3-7, 118:8-13, 216:9-217:11.)  When her records did not reveal any Depakote prescriptions, Mrs. Dotegowski changed her testimony and now claims that she received months of Depakote samples from Dr. Kaplan.  (Ex. 4, 4/23/14 M. Dotegowski Dep. at 16:20-17:21, 20:21-21:17, 51:20-52:18.)   Plaintiffs have taken that position even though, between January 1998 and the occurrence of Emily's spina bifida, Mrs. Dotegowski was taking somewhere between 11 and 15 medications.  (*See, e.g.* Ex. 5, 1998 Schwartz Med. Recs. at 267, 271-73 (memorializing reports that Mrs. Dotegowski was taking Levaquin, Duratuss, Tussi Organidin, Prednisone, Percocet, Effexor, alprazolam (a/k/a Xanax), Zyprexa, Prilosec, Humibid LA, a Flovent inhaler, Albuterol, Floxin); Ex. 6, 1/23/98 Malcarney Med. Rec. (Guaifenex, Prednisone, Prilosec, Xanax, Effexor, Zyprexa, Levaquin); Ex. 7, 2/9/98 West Jersey Health Sys. Med. Rec. (Zantac, Imodium, Prilosec, alprazolam, Effexor, Zyprexa); Ex. 8, 3/1/98 Underwood Mem. Hosp. Med. Rec. (Prilosec, Humibid, Effexor, Alprazolam, Guaifenex, Levaquin, Oxycodone/APAP.)   Her insurance paid for many of her prescription medications but—per Plaintiffs—not Depakote.  The fact that Mrs. Dotegowski's insurance company purportedly did not pay for her alleged Depakote prescriptions in 1997-98, but apparently paid for all others, bears on whether she took Depakote at all and the dosage, if any, that she took when Emily's spina bifida occurred:

8

Q:    Ms. Dotegowski, are there any other samples that Dr. Kaplan ever gave you to your recollection other than Depakote?

A:    I think in the beginning when I started Effexor, to see, and then it turned to prescription.

Q:    Anything else?

A:    No.

Q:    Did you ever check to see if you had insurance to cover the cost of Depakote?

      THE WITNESS:       No.

Q:    Did you ever check to see what the co-pay would be for prescriptions for Depakote?

A:    No.

Q:    To the best of your recollection, was your Depakote use similar to your Effexor use, where you started with regard to samples and then it moved on to prescription use?

A:    Depakote was always a sample.

Q:    And how was it, ma'am, that you were getting a sample for Depakote for so long but paying for all the other medications?

A:    I believe the Depakote was expensive.  Dr. Kaplan was very concerned about my financial situation, and he was trying to help me out without costing me everything, and he provided samples for me.

Q:    Okay.  But you don't know how much it was going to cost; correct?

A:    I just know it was supposed to be expensive.

Q:    But you don't know how much it was going to cost; right?

      THE WITNESS:       I would have no idea.

Q:    Did Dr. Kaplan offer to give you samples for all – excuse me – the other meds you were on as well?

A:    No.

9

> Q:      Did he tell you why he was doing it for Depakote as opposed to all the other meds?
>
> THE WITNESS:      I believe he did it because he knew my financial situation.

(Ex. 4, 4/23/14 M. Dotegowski Dep. at 47:10-49:8 (internal objections and notations omitted).)

To facilitate the jury's consideration of whether Dr. Kaplan provided Mrs. Dotegowski with handfuls of free Depakote samples in 1997-98 while her insurance company paid for every other medication—including some for her mental condition—that she took during that time period, the Court should not exclude collateral source evidence related to benefits for Mrs. Dotegowski.  Such evidence bears on Plaintiffs' causation theories having nothing to do with whether collateral sources benefits are available for Emily and should he admitted.

## Plaintiffs' MIL #2

Plaintiff Emily Dotegowski moves to exclude any comment, evidence, testimony, argument, or inference that she should not be able to recover damages for the future cost of care and supervision because family members or friends may be able to take care of her. Plaintiff anticipates Abbott will attempt to present evidence that Plaintiff could live with and receive care from other family members, neighbors or friends, thus negating the need for her to pay for future home care or facility supervision. This evidence is inadmissible because it is purely speculative and fails to account for the age of Plaintiff's current primary care takers or the viability of any other party caring for Plaintiff.

This Court in *Kaleta* and *Raquel* analyzed this issue and found that Abbott would not be allowed introduce such evidence. *D.W.K.*, No. 3:14-CV-847, Dkt. No. 286, Order Regarding Motions *in limine* ("*Kaleta* Order") ("Illinois follows the 'reasonable-value' approach to the collateral source rule and 'allows all injured plaintiffs to recover the reasonable value of medical

expenses and does not distinguish between those who have private insurance, those whose expenses are paid by the government, or those who receive their treatment *on a gratuitous basis*.' *See Wills*, 892 N.E.2d at 1030 (emphasis [in Dkt. 286]). Gratuitous care is not guaranteed or even legally required after the minor plaintiff turns 18."); s*ee also* May 16, 2017 Order on Plaintiffs' Motions *in Limine*, Dkt. No. 268 at *2-3.

Most recently, Judge Yandle excluded such evidence from the *Bartolini* trial. *See* November 16, 2017 Order ("*Bartolini* MIL Order"), Case No. 17-cv-1146-SMY-SCW, Dkt. No. 44, *3 (S.D. Ill. Nov. 16, 2017). Thus, any evidence or argument that a family member or friend has agreed to or may be able to take care of Plaintiff in the future is speculative, irrelevant, unfairly prejudicial.

### Abbott's Response to MIL #2

Abbott acknowledges the Court's prior rulings in *Kaleta, Raquel,* and *Bartolini*.   But under New Jersey law, jurors must assess "the reasonableness of the charge for future medical care," including, when appropriate, what expenses are "reasonable and necessary to provide care at the family home."  *Hall ex rel. Hall v. Rodricks*, 774 A.2d 551, 557 (N.J. Super. Ct. App. Div. 2001) (finding that the jury was properly instructed to this effect).  What is "necessary" for Emily's care can only be determined by considering what family and other support she has received and is reasonably expected to receive in the future.

Any assessment of future care that does not account for the care that Emily receives from her family or lower-cost care providers would otherwise risk being inflated.  Abbott should be allowed to rebut such testimony to allow the jury, in the event of a verdict for Plaintiffs, to accurately assess Plaintiffs' damages in this case.  *Id*. at 554-55 (defendants' expert testifying that the annual cost of nursing home would be less expensive than the annual cost of home care); *see also, e.g., Ramrattan v. Burger King Corp.*, 656 F. Supp. 522, 525 (D. Md. 1987) (denying

11

plaintiff's motion to exclude defendant's evidence of the lower-cost nursing home care as alternative to at-home care plaintiff claimed in damages calculation, reasoning that "defendant is entitled to offer proof of any facts which tend to reduce the amount of money required for just compensation to the plaintiff"); *Kearney v. Auto-Owners Ins. Co.*, 2007 WL 3124879, at *1 (M.D. Fla. Oct. 24, 2007) (denying defendant's motion to exclude evidence of plaintiff's future medical and life-care expenses, but holding that defendant may cross-examine plaintiff's expert regarding "whether [plaintiff] has incurred these types of medical and life-care expenses to date").

To allow Abbott to present necessary rebuttal evidence, Plaintiffs' Motion should be denied.

## **Plaintiffs' MIL #3**

Plaintiff Emily Dotegowski moves to exclude any evidence, argument, inference or suggestion that Maryann Dotegowski did not take Depakote at the time of Plaintiff's conception or was not prescribed Depakote by Dr. Kaplan.  As explained in detail below, under the doctrine of judicial estoppel, Abbott is now barred from taking the position that Maryann Dotegowski did not or may not have taken or been prescribed Depakote in this case.   *See, e.g., Adkins v. VIM Recycling,* 644 F.3d 483, 495 (7th Cir. 2011)(Under the equitable principle of judicial estoppel, "a party who prevails on one ground in a prior proceeding cannot turn around and deny that ground in a later proceeding.").

As the Court is aware, this case previously was pending in the Superior Court of the State of California, San Francisco County.  A jury trial on the issue of the governing California statute of limitations and related application of the discovery rule took place in that court in August 2015.  Abbott obtained a favorable ruling from a jury on that issue after arguing that Mrs.

Dotegowski took Depakote, was prescribed the drug by Dr. Kaplan, later obtained knowledge that Depakote may have caused her daughter's injuries, and that she should have known that she had a potential claim against either Abbott or her prescribing doctor long before the case actually was filed.

So, in brief, here is the situation: in the upcoming trial of this case, Abbott wants to tell the jury that Mrs. Dotegowski did not or may not have even taken or been prescribed Depakote. But in order to win a favorable ruling in front of another jury, in a successful attempt to get the case dismissed, Abbott took the opposite position, that she was in fact prescribed Depakote by Dr. Kaplan.  This was stated over and over to the jury.  For example, Abbott's counsel argued to the jury during opening statement:

> She conceived her child in March, and here is what happened after she conceived her child. Mrs. Dotegowski learned she was pregnant…She was on three psychiatric medicines at the time; Depakote, Xanax and Zoloft, all prescribed by Dr. Kaplan. The first thing she did when she learned she was pregnant she called Dr. Kaplan and said – she stopped the medicine so she could talk to him….This is what she's testified Dr. Kaplan told her. Stop taking the Depakote.
>
> ***
>
> So when her psychiatrist said of these three medicines that got you through that, what she said was a fragile time, of those three medicines, stop one of them cold turkey, that was real significant to her, the evidence will show. Real significant to her. You will ask yourself whether that was a signal to her that there was something about Depakote her doctor hadn't told her about.
>
> ***
>
> So, the evidence that we have seen leads to the connection or connecting the dots between the evidence. At that moment – and that is dated in mid-July or early August 1998, she's about four months pregnant, Mrs. Dotegowski is. At that moment, she knew her baby would have spina bifida. She knew that Depakote causes spina bifida. So it's – taking Depakote is a risk to a woman of spina bifida. She knew she wasn't warned of that risk, and now she knew from Dr. Kaplan himself that he knew of the risk all along. That is a reasonable suspicion that someone – someone had not warned her of the risk of spina bifida.

Ex. A, Excerpts from Abbott's Opening Statement in the Mini-trial on the Issue of Statute of Limitations at 90:6-18, 91:14-21, 101:8-19.

Abbott's argument and evidence presented at trial was centered on the idea that Mrs. Dotegowski was taking Depakote at the time of Plaintiff's conception and was told shortly thereafter that Plaintiff had spina bifida, which can be caused by Depakote.  Indeed, Abbott's trial strategy, its positions and its overt representations to the jury were based on the jury believing that she was prescribed Depakote and that Dr. Kaplan did not give her a warning about the drug.  Based on this, the jury determined that Mrs. Dotegowski should have suspected her cause of action earlier and did not timely file Plaintiff's case under the governing California statute.

Although the positions expressly stated by Abbott in opening statement are enough to apply the doctrine (and understandably hold Abbott to its own words), Abbott's questioning of Mrs. Dotegowski at the trial reinforces the argument.  *See* Ex. B, Excerpts from the Trial Testimony of Maryann Dotegowski, at 185 ("Dr. Kaplan prescribed Depakote for you, right?"), 220 ("Now I want to ask you a few questions about before you knew you were pregnant when you were taking Depakote, okay?"), 236 ("That visit, because that is when Dr. Kaplan told you about spina bifida, you remember that visit very clearly, don't you?"), 240 ("All of those doctors, the doctors now in 1998, had told you that Depakote has been linked, correct, to spina bifida?").

And Abbott went on in closing:

That was her testimony before.  You should hold her to that.  You can't just come in here and say something else.  She has a clear memory of that conversation when she was given Depakote by Dr. Kaplan.

***

Those are the dates, starting June 1 of 1998, when Mrs. Dotegowski did learn of Depakote spina bifida risk . . . .

14

\*\*\*

She called Dr. Kaplan and he said 'Stop the Depakote.'  He said, 'Stop the Depakote.'

\*\*\*

She got on several different medications.  They tried different ones.  They finally ended up on Depakote, Xanax and Zoloft, and it did the job for her, fortunately.

\*\*\*

Dr. Kaplan gave her the medicine in his office.  She never went to the pharmacy.  He didn't give her any warning, written or oral, and so she didn't get anything.

So here is – the evidence shows here is someone who's carrying a child with spina bifida.  She knows then – anybody would – that it was due to a risk from Depakote for spina bifida that no one had told her about before she got pregnant.  She knew that then.

\*\*\*

And when he prescribed Depakote to Mrs. Dotegowski, he knew that Depakote can cause spina bifida.  He knew that.

Ex. C, Excerpts from Abbott's Closing Argument in the Mini-trial on the Issue of Statute of Limitations at 374, 376, 386, 387, 389, 396, 402-03.

Abbott cannot now change its position regarding Mrs. Dotegowski's Depakote use in an effort to gain an advantage in the upcoming trial of this case in front of a different jury. (And it is clear why conjuring up a fact issue about Mrs. Dotegowski's Depakote use would inure to Abbott's benefit in the upcoming trial).

Given Abbott's position during the related trial in California, Abbott is estopped from taking a different and inconsistent position about Mrs. Dotegowski's Depakote use here.

As the Seventh Circuit has explained, judicial estoppel "is a doctrine intended to prevent the perversion of the judicial process" and to prevent litigants from playing "fast and loose with the courts."  *In the Matter of Thomas v. Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990).  "Where a

15

party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Id*. (citing and quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).

Judicial estoppel is a "flexible equitable doctrine" and its application is within the court's "equitable judgment and discretion." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013). The doctrine is to be applied where a party has taken or will take clearly inconsistent positions and where the party prevailed when taking the earlier position. *See Cassidy*, 892 F.3d at 641. The Seventh Circuit has cautioned that there are no rigid rules to the doctrine's application, only guideposts to allow courts to consider the equities of allowing a party to change its positions to suit its interests at the moment. *Grochocinski*, 719 F.3d at 795.

"Judicial estoppel does not come in to play only when a party attempts to retreat in a second case from an argument on which it prevailed in a separate earlier case. It also prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *In re Airadigm Comms, Inc.,* 616 F.3d 642, 662 (7th Cir. 2010)(internal quotations omitted)(citing cases). It "prevents litigants from manipulating the judicial system by prevailing in different cases or phases of a case by adopting inconsistent positions." *Spaine v. Community Contacts, Inc.,* 756 F.3d 542, 547 (7th Cir. 2014).

The doctrine's application here is straightforward. As shown in detail above, Abbott went in front of jury #1 and, in an effort to win that trial, said that Mrs. Dotegowski took Depakote and was prescribed the drug by Dr. Kaplan. Abbott's arguments prevailed and it won the trial. Abbott cannot now stand in front of jury #2 and represent that she did not take Depakote and was not prescribed the drug by Dr. Kaplan because taking that position is now in its interest. Although the Seventh Circuit has held that a showing of prejudice to one of the

litigants is not required to apply the doctrine (*Cassidy*, 892 F.2d at 641, n.2), the prejudice to Plaintiff Emily Dotegowski in allowing Abbott to take these inconsistent positions is plain.  *See, e.g., Butler v. Village of Round Lake Police Dep't*, 585 F.3d 1020, 1022-23 (7th Cir. 2009)("In order to secure disability benefits, Butler said he was unable to perform basic police duties. Now, in order to claim damages, he says he is, or at least was, able to perform those duties.  This is just the kind of about-face judicial estoppel is designed to prevent.").

**<u>Abbott's Response to Plaintiffs' MIL #3</u>**

After a California jury found their claims time-barred and the five-plus years they spent pursuing their claims in California ended with a final judgment in favor of Abbott, Plaintiffs Maryann and Emily Dotegowski—lifelong residents of New Jersey—traveled halfway back across the country to re-file their claims in this Court.  When Abbott moved to dismiss their claims based on the California judgment entered against them, Plaintiffs argued that "the **<u>sole</u>** issue decided by the California jury was whether the discovery rule could be invoked to toll the statute of limitations. The disposition was purely procedural and did not reach or resolve the merits of the case."  (Pls.' Resp. in Opp. to Def.'s Mot. to Dismiss Pls.' Compl. (Doc. 9) at 2 (July 11, 2016) (emphasis in original).)  The Court agreed, over Abbott's objection:

> At Defendant's request, and over the objections of Plaintiffs, the California trial was bifurcated into two phases thereby expressly separating a decision on the 'merits' from the question concerning the statute of limitation.  ***The consequence of Defendant's decision was a verdict—and therefore a judgment—that did not reach the merits of the claim.***

(10/19/16 Order (Doc. 12) at 6 (emphasis added).)

Plaintiffs, nevertheless, now argue that the jury in the California limitations trial addressed the merits of whether Mrs. Dotegowski took Depakote when Emily's spina bifida occurred, that accordingly Abbott should be estopped from denying that claim, and that Illinois jurors

17

should not reach this issue.  Plaintiffs' arguments fail to satisfy any of the three factors that "typically inform" whether to apply the doctrine of judicial estoppel in "a particular case:"

- "a party's later position must be clearly inconsistent with its earlier position;"

- the party must have "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled;" and

- "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*In re Knight-Celotex, LLC*, 695 F.3d 714, 721-22 (7th Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (internal quotation omitted)).

<u>First</u>, Abbott has taken no inconsistent position.  Its denial of Plaintiffs' claim that Mrs. Dotegowski took Depakote during her pregnancy with Emily has never wavered.  California statutory law protected Abbott's right to have its limitations defense resolved separately from such liability defenses while Plaintiffs' claims were pending in the courts of that state.  *See* Cal. Civ. Proc. Code § 340.4 (setting five-year limit on claims like Plaintiffs', but subject to discovery rule); Cal. Civ. Proc. Code § 597 (providing for bifurcated proceedings) ("Section 597").  Enforcing that right, the Honorable Judge Curtis E.A. Karnow bifurcated the resolution of Plaintiffs' claims while they remained pending in California, made clear that the California limitations trial would focus on Abbott's limitation defense ("Phase 1," to use his phrasing), and reserved liability issues for later trial proceedings, if any ("Phase 2").

One of the reasons why California law allows limitations to be tried separately is because the critical issue for the limitations defense—whether the plaintiff should have known of a cause of action—is based on the assumption that there is usage and causation.  A defendant should not be required to concede those points for the purpose of a limitation defense before the same jury

that would assess the merits.  That is why California allows limitations defenses to be presented to a jury separate from the liability defense.  If Plaintiffs' argument in this action is allowed, it would defeat the entire purpose behind the California statute.

*Second*, no court or jury has accepted the claim made by anyone—particularly Abbott— that Mrs. Dotegowski allegedly took Depakote when Emily's spina bifida occurred.  The jury in the California limitations trial only resolved whether Mrs. Dotegowski discovered or knew facts "that would have caused a reasonable person to suspect, that Emily Dotegowski had suffered harm that was caused by someone's wrongful conduct."  (Ex. 9, 8/24/15 *Dotegowski* Verdict Form.)  That verdict—even encompassing possible wrongdoing by Dr. Kaplan for the purposes of triggering Plaintiffs' five-year limitations period under California law—did not require or include a finding that Mrs. Dotegowski took Depakote.[6]

*Third*, having an Illinois jury decide, among other things, whether Mrs. Dotegowski took Depakote when Emily's spina bifida occurred would not provide Abbott with an unfair advantage or impose an unfair detriment on Plaintiffs.  That is a critical issue for the trial that Plaintiffs sought when they re-filed their claims here.  Particularly since Judge Karnow sanctioned John Eddie Williams, Plaintiffs' counsel, for crossing the line between limitations-

---

[6] *See, e.g., Jolly v. Eli Lilly & Co.*, 751 P.2d 923, 927 (Cal. 1988) (discovery rule requires only that plaintiff "suspects or should suspect that her injury was caused by wrongdoing, that *someone* has done something wrong to her") (emphasis added); *Hendrix v. Novartis Pharma. Corp.*, 975 F. Supp. 2d 1100, 1108-09 (C.D. Cal. 2013) ("[F]acts sufficient to put a reasonable plaintiff in suspicion that he has been wronged" is enough to trigger the running of the statute of limitations), *aff'd*, 647 F. App'x 749 (9th Cir. 2016); *Rose v. Fife*, 207 Cal. App. 3d 760, 770, 255 Cal. Rptr. 440 (Cal. Ct. App. 1989) ("[P]laintiff did not need to know the identity of the manufacturer of the IUD in order to file her action.  She knew the identity of the person who prescribed the IUD and she could have timely sued him, naming the manufacturer as a Doe defendant.  Nor did she need to know all the facts which prove fault before filing her action.  It is pretrial discovery which brings out the specifics of wrongdoing, i.e., the facts to establish a plaintiff's case."), *modified* (Feb. 1, 1989).

related issues and liability-related issues (such as usage) during the California limitations trial, Plaintiffs have no basis to invoke judicial estoppel.

The hypocrisy of Plaintiffs' reliance on an equitable doctrine that prevents "litigants from manipulating the judicial system" (Pls.' Mot. at 16 (internal quotation marks and citation omitted)), cannot be understated.  Two New Jersey residents ask this Illinois Court to lighten their burden to prove that Depakote allegedly caused Plaintiffs' damages, bar an Illinois jury from determining that issue, and strip Abbott of a defense that it has pursued for years based on a California jury verdict and judgment that Plaintiffs previously represented to this Court was "purely procedural" in order to defeat Abbott's motion to dismiss.  (Pls.' Resp. in Opp. to Def.'s Mot. to Dismiss Pls.' Compl. (Doc. 9), at 2 (July 11, 2016).)  If anything, judicial estoppel should prohibit Plaintiffs from, now, re-characterizing the California limitations trial as involving anything other than "the **sole** issue" of "whether the discovery rule could be invoked to toll the statute of limitations."  (*Id.* (emphasis in original).)  Since that argument allowed their claims to survive Abbott's motion to dismiss, Plaintiffs should be stuck with it and have no basis to prevent jurors from evaluating whether Mrs. Dotegowski was even taking Depakote when Emily's spina bifida occurred.

### A.     The California limitations trial did not resolve Plaintiffs' liability claims. Instead, it protected Abbott's right to pursue alternative defenses.

Since Plaintiffs chose to file their claims in California, those claims were subject to Section 597:

> When the answer pleads that the action is barred by the statute of limitations, or . . . . sets up any other defense not involving the merits of the plaintiff's cause of action but constituting a bar or ground of abatement to the prosecution thereof, the court may, either upon its own motion or upon the motion of any party, proceed to the trial of the special defense or defenses before the trial of any other issue in the case, and if the decision of the court, or the verdict of the jury, upon any special defense so tried (other than the defense of another action pending) is in favor of

> the defendant pleading the same, judgment for the defendant shall thereupon be
> entered and no trial of other issues in the action shall be had unless that judgment
> shall be reversed on appeal or otherwise set aside or vacated . . . .

That statute avoids "the waste of time and money caused by an unnecessary trial of issues that are moot by reason of the bar of the statute of limitations." *Baxter v. Peterson*, 58 Cal. Rptr. 3d 686, 689 (Cal. Ct. App. 2007). It also encourages separate trials of special defenses that might abate a plaintiff's claim and promotes the economical and speedy administration of justice. *See, e.g., Booth v. Bond*, 132 P.2d 520 (Cal. Ct. App. 1942). "Defenses based on the statute of limitations are frequently bifurcated" in California "and tried separately from a plaintiff's liability case." *Baxter*, 58 Cal. Rptr. at 689.

Far from deciding disputed issues about, among other things, whether Mrs. Dotegowski took Depakote during her pregnancy with Emily, the California limitations trial resolved a statute of limitations issue governed by California law and "susceptible to an early determination, with relatively little investment of time and effort." (Ex. 10, 2/2/15 Order re: Mots. in Limine & to Bifurcate (Punitive Damages & Statute of Limitations), *Dotegowski v. Abbott Labs. Inc.*, No. CGC-10-506794, at 28 (Cal. Super. Ct.) (Karnow, J.) ("*Dotegowski* MIL Order") (granting Motion to Bifurcate Statute-of-Limitations-Related Issues from Liability).) Unless rejected outright, Plaintiffs' claims that Mrs. Dotegowski took Depakote during her pregnancy with Emily are not ones that could be resolved "with relatively little investment of time and effort":

- **<u>Dr. Kaplan's records were destroyed before Abbott had a chance to collect them.</u>** Any of his records memorializing Mrs. Dotegowski's medication use immediately before and during her pregnancy with Emily were lost. (*See* Ex. 11, 4/12/14 Kaplan Dep. at 12:2-24; Ex. 12, Affidavit of No Records (marked as Exhibit 2 to Dr. Kaplan's deposition).) Dr. Kaplan himself has no recollection of prescribing Depakote to Mrs. Dotegowski. (See Ex. 11, 4/12/14 Kaplan Dep. at 76:25-77:3.)

- **<u>Abbott has identified at least seven encounters that Mrs. Dotegowski had with healthcare providers—be them in the form of doctors' visits or hospitalizations—between January 1, 1998 and the time Emily's spina bifida occurred.</u>** (*See* Ex. 5,

1/13/98 Schwartz Med. Rec. at 273; Ex. 6, 1/23/98 Malcarney Med. Rec.; Ex. 13, 1/27/98 West Jersey Health System Med. Rec.; Ex. 14, 2/9/98 Masciarelli Med. Rec.; Ex. 15, 2/27/98 Comisky Med. Rec.; Ex. 5, 2/28/98 Schwartz Med. Rec. at 271-72; Ex. 8, 3/1/98 Underwood Mem. Hosp. Med. Rec.).)  Those records document Mrs. Dotegowski's use of various prescription medications, but none refers to Depakote.  Every single one of these records serves to rebut Mrs. Dotegowski's claim that she used Depakote at any time, much less when Emily's spina bifida occurred.

- **Mrs. Dotegowski claims that, before Emily was conceived, Mrs. Dotegowski told none of her healthcare providers about her Depakote use, except her Dr. Anthony Masciarelli, a gastroenterologist whom she has known for many years.**  (*See* Ex. 3, 8/23/12 M. Dotegowski Dep. at 203:7-14, 206:6-10, 207:6-208:5.)  Dr. Masciarelli's records reflect no such discussion.  (*See, e.g.,* Ex. 14, 2/9/98 Masciarelli Med. Rec.)  Dr. Masciarelli remembers no such conversation, does not believe that he would left it undocumented had it occurred, and admits that not sharing that information with Mrs. Dotegowski's other physicians would have endangered Mrs. Dotegowski's health.  (*See* Ex. 16, 4/22/14 Masciarelli Dep. at 43:22-44:7, 63:20-66:12.)

- **Mrs. Dotegowski initially testified that she took Depakote that Dr. Kaplan prescribed for her and that she purchased from Pathmark Pharmacy in New Jersey.**  (*See* Ex. 3, 8/23/12 M. Dotegowski Dep. at 25:2-26:15, 105:3-7, 118:8-13, 216:9-217:11.)

- **When no records memorializing those alleged purchases could be found, Mrs. Dotegowski changed her testimony and now claims that she took months of Depakote samples provided to her.**  (Ex. 4, 4/23/14 M. Dotegowski Dep. at 16:20-17:21, 20:21-21:17, 51:20-52:18.)

Abbott is aware of no case in which any court has ruled that a defendant's pursuit of its limitations defense during a bifurcated proceeding could compromise its defense to a plaintiff's liability claims.  Plaintiffs have identified no such authorities for the Court.

The absence of support for Plaintiffs' position is understandable, since, if adopted, it would diminish the efficiency and fairness that Judge Karnow recognized in ordering a bifurcated trial of Plaintiffs' claims.  Federal courts, including the Seventh Circuit, agree.

There is little point in holding a full trial if a surgical approach can cut away needless disputes.  A judge on top of a case can identify dispositive issues, and often these issues can be tried quickly and economically.  Thoughtfully used, the trial limited to a single issue can assist litigants, witnesses, and courts alike. *MCI Communications Corp. v. AT&T*, 708 F.2d 1081, 1166-68 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).  The statute of limitations is

a prime candidate for a limited trial under Rule 42(b), both because the issues may overlap very little with the merits of the case and because the potential savings are greatest when a case is put to death at an early stage. *Gordon v. National Youth Work Alliance*, 675 F.2d 356, 360-61 n.3 (D.C.Cir.1982).[7]

Judge Karnow even expressly recognized that the California limitations trial ***"was set separately such that the issue of delayed discovery could be treated by the fact finder without consideration of whether Abbott did or did not in fact do the tortious acts complained-of in the complaint***." (Ex. 17, 8/24/15 Show Cause Order, *Dotegowski v. Abbott Labs. Inc.*, No. CGC-10-506794, at 1 (Cal. Super. Ct.) (emphasis added).) Plaintiffs now ask this Court to disregard that focus, to discard the bifurcated proceedings that Section 597 expressly allows in California (the venue in which Plaintiffs chose to file their claims originally), and to prejudice Abbott for exercising its statutory right.

The California limitations trial that Judge Karnow ordered protected Abbott's right to present alternate defenses, which are standard and proper in litigation. *See* Fed. R. Civ. P. 8(d) (protecting a litigant's right to plead alternate claims or defenses). Had there been no California limitations trial, Abbott could argue (1) that it does not believe Mrs. Dotegowski took the

---

[7] *Stewart v. RCA Corp.*, 790 F.2d 624, 629 (7th Cir. 1986) (discussing the procedural deficiencies and inefficiencies of the lower court proceeding); *see also, e.g., Urland by & through Urland v. Merrell-Dow Pharm., Inc.*, 822 F.2d 1268, 1270 (3d Cir. 1987) (district court properly bifurcated statute of limitations issue, presenting that issue to jury as threshold matter); *Yung v. Raymark Indus.*, 789 F.2d 397, 401 (6th Cir. 1986) ("[S]eparate trials on a statute of limitations issue are particularly appropriate" "because court time and litigation expenses are minimized."); *Braun v. Berenson*, 432 F.2d 538, 543 (5th Cir. 1970) (finding "plaintiff's contention that the district court abused its discretion in ordering a separate trial on the limitations issue without merit"); *Burgess-Lester v. Ford Motor Co.*, 2007 WL 3088082, at *1 (N.D.W. Va. Oct. 22, 2007) ("bifurcating the trial on the issue of Ford's statute of limitations defense would promote convenience, avoid prejudice and be conducive to expedition and judicial economy"); *Kimmel v. Paul, Weiss, Rifkind, Wharton & Garrison*, 1995 WL 232737, at *3 (S.D.N.Y. Apr. 19, 1995) (Sotomayor, J.) ("Because [defendant's] statute of limitations defense raises significant legal issues, the resolution of which will involve issues independent of [plaintiffs'] underlying claims, I order a separate trial pursuant to Rule 42(b) on the statute of limitations question.").

Depakote to which Plaintiffs attribute their damages, but (2) if she did, Plaintiffs filed their claims too late. *See, e.g., Cole v. Janssen Pharm., Inc.*, 2017 WL 6372777, at *4-5 (E.D. Wis. Dec. 12, 2017) (defendant alleged plaintiff failed to take drug and claim was barred by statute of limitations); *Johnson v. SmithKline Beecham Corp.*, 55 F. Supp. 3d 603, 617 (E.D. Pa. 2014) ("Defendants argue persuasively that Plaintiff has produced no admissible evidence showing that his mother ingested thalidomide at any point during her pregnancy.  In light of my decision that Plaintiff's claims are time-barred, however, I need not address this argument.") (citation omitted).

The verdict returned for Abbott and the judgment entered in California should have resolved Plaintiffs' claims in perpetuity.  (*See* Abbott's Mot. to Dismiss (Doc. 8) (June 7, 2016); Abbott's Reply in Support of Its Mot. to Dismiss (Doc. 10) (July 28, 2016).)  Even if the California jury's verdict and Judge Karnow's final judgment did not extinguish Plaintiffs' claims, Plaintiffs should merely proceed to the "Phase 2" trial that Judge Karnow envisioned when he bifurcated the trial of their claims—one to resolve issues related to Abbott's potential liability, including whether Mrs. Dotegowski even took Depakote when Emily's spina bifida occurred.

> **B.  Abbott plainly has not "succeeded" in proving that Mrs. Dotegowski took Depakote during her pregnancy with Emily.[8]  In fact, Judge Karnow and the parties recognized that the California limitations trial would not concern that issue.**

To avoid "needless disputes" as part of the bifurcation that he ordered, Judge Karnow also made clear that liability issues had to await a "Phase 2 trial on the merits."  As Judge Karnow explained, the Phase 1 (limitations) trial

---

[8] *In re Knight-Celotex, LLC*, 695 F.3d at 721-22 (quoting *New Hampshire*, 532 U.S. at 750-51 (emphasis omitted).

> was devoted only to a statute of limitations rule, specifically the delayed discovery rule, which (in short) addressed evidence of whether plaintiff knew or should have known of someone's wrongful conduct before a certain date.  If the jury had decided in plaintiff's favor, i.e. that the plaintiff was not so on notice of wrongful conduct, then we had planned a Phase 2 trial on the merits of defendant Abbott's alleged wrongful actions, causation, and damages.

(Ex. 18, 9/29/15 Order Imposing Sanctions on John Eddie Williams, *Dotegowski v. Abbott Labs. Inc.*, No. CGC-10-506794, at 1-2 (Cal. Super. Ct.).)  Just as they do in their Motion, Plaintiffs repeatedly tried to blur the line separating the two phases that Judge Karnow ordered, and Judge Karnow repeatedly rejected those efforts.  (*See, e.g.,* Ex. 19, 8/20/17 *Dotegowski* SOL Trial Tr. at 252:1-4 (admonishing Plaintiffs' counsel for referencing his take on deposition testimony by Dr. Tracey Heimberger during the California limitations trial: "The focus of this trial I thought was 100 percent clear, which is: It's a statute of limitations trial.  It is focused on what this plaintiff knew or did not know, what she suspected or did not suspect."); Ex. 10, *Dotegowski* MIL Order at 28, n8 (seeing "no reason to think the experts or Abbott witnesses listed by plaintiffs" in a witness list for the California limitations trial "have anything to do with the issue of Mrs. Dotegowski's knowledge, or when she ought to have known, of Abbott's alleged wrongful conduct").)

In its Section 597 request, Abbott also made clear that, in the event it did not prevail during the California limitations trial (Phase I), it would continue to take the position that Dr. Kaplan did not prescribe and Mrs. Dotegowski did not take the Depakote to which Plaintiffs attribute Emily's spina bifida during any subsequent liability trial (Phase 2) proceedings.  Abbott even explicitly included Mrs. Dotegowski's Depakote usage as one that would have to be resolved, if at all, during any Phase 2 liability trial proceedings:

> Section 340.4 is not the only defense that Abbott has raised and is far from the only matter that Plaintiffs may have to address during a general liability trial.  Plaintiff's compensatory damage claims have triggered the following disputes,

> among others: (1) whether Ms. Dotegowski took Depakote during the critical time period of her pregnancy with Emily, such that Depakote could have even arguably contributed to Emily's spina bifida...
>
> *     *     *     *     *
>
> A limitation mini-trial would not involve many of the most intensely disputed factual issues potentially involved in this case.  If a jury were to find for Abbott as part of a limitations mini-trial, the Court and California jurors would be spared the lengthy, fact-intensive proceedings needed to sift through any conflicting evidence concerning, for example, whether Ms. Dotegowski took Depakote during the critical time period in her pregnancy with Emily.

(Ex. 20, Motion to Bifurcate Statute-of-Limitations-Related Issues from Liability, *Dotegowski v. Abbott Labs. Inc.*, No. CGC-10-506794, at 7, 11 (Cal. Super. Ct. Dec. 12, 2014) (emphasis omitted).)

At times, Plaintiffs also have acknowledged that the California limitations trial focused solely on Abbott's limitations defense.  When they re-filed their case in this Court, Plaintiffs asserted that "the **sole** issue decided by the California jury was whether the discovery rule could be invoked to toll the statute of limitations.  The disposition was purely procedural and did not reach or resolve the merits of the case."  (Pls.' Resp. in Opp. to Def.'s Mot. to Dismiss Pls.' Compl. (Doc. 9) at 2 (July 11, 2016) (emphasis in original); *see also id.* at 8 n.21 ("To the extent the California judgment has any preclusive effect it would only relate to the issue that was actually determined by the jury.") (emphasis in original); Pls.' Compl. (Doc. 1) at 3 (Apr. 18, 2016) ("The disposition of a case as a result of a statute of limitations is not considered a final judgment on the merits.").)  It was based on the same conclusion that the California limitations trial ended with "a verdict—and therefore a judgment—that did not reach the merits of" Plaintiffs' claims that the Court allowed those claims to proceed.  (10/19/16 Order (Doc. 12).)

By Plaintiffs' own admission, as acknowledged in the Court's denial of Abbott's Motion to Dismiss, and as repeatedly stated by Judge Karnow, the California jury did not reach disputed

issues of fact bearing on Abbott's liability, including causation.  Plaintiffs therefore cannot prove

that Abbott "succeeded in persuading" any Court to accept any purported position about whether

Mrs. Dotegowski did or did not take Depakote during her pregnancy with Emily and cannot

satisfy the elements of judicial estoppel.[9]

### C. Plaintiffs would have this Court punish Abbott for adhering to Judge Karnow's order prohibiting liability-related issues from being argued and resolved during the California limitations trial.

Plucking snippets from Abbott's arguments during the California limitations trial,

Plaintiffs would have this Court believe that Abbott abandoned the parties' years-long arguments

about whether Mrs. Dotegowski took Depakote during her pregnancy with Emily.  Far from

determining that issue, the California jury was instructed to assume Plaintiffs' allegations as true

for purposes of its limited, statute of limitations inquiry:

> There is no evidence in this case, and there won't be any, that Abbott or any doctors or anyone else actually did or didn't do anything wrongful.  ***The issue in this case is only whether Mrs. Dotegowski discovered or knew of facts that would have caused a reasonable person to suspect wrongdoing.***  Now, obviously, you need to know something about what kind of allegation of wrongdoing is at issue here, and we have told you it's about failure to warn.  ***Remember, that in this trial these are just allegations of wrongdoing, and you must not assume that they are true or not true.  It doesn't matter if the allegations are true or not for the purposes of the question that is going to be presented to you.***

---

[9] *In re Knight-Celotex, LLC*, 695 F.3d at 721-22 (quoting *New Hampshire*, 532 U.S. at 750-51).  Yet, Plaintiffs (1) previously took a "clearly inconsistent" position with the one that they are taking in their Motion (i.e., the California limitations trial concerned liability issues, such as whether Mrs. Dotegowski took Depakote during her pregnancy with Emily); (2) Plaintiffs "succeeded in persuading" this Court to accept their earlier position and deny Abbott's Motion to Dismiss (Doc. 8); and (3) Plaintiffs now wish to argue—during a trial that the final, un-appealed judgment entered in California should bar—that Abbott somehow convinced a California jury to find that Mrs. Dotegowski took Depakote when, in fact, the evidence does not support that finding.  *In re Knight-Celotex, LLC*, 695 F.3d at 721-22 (quoting *New Hampshire*, 532 U.S. at 750-51 (internal quotation omitted)).  If judicial estoppel has any application to this case, it bars Plaintiffs from characterizing the California limitations trial as resolving a narrow procedural issue for the purposes of opposing Abbott's motion to dismiss this case <u>and</u> characterizing it as a merits trial that somehow inhibits Abbott's defenses during any upcoming liability trial.

(Ex. 19, 8/20/15 *Dotegowski* SOL Trial Tr. at 264:6-264:19 (emphasis added).)

Abbott also had to accept that premise, particularly since Plaintiffs' decade-plus delay in filing their claims resulted in the loss of key records bearing on limitations issues.  Plaintiffs' Motion carefully selects excerpts from Abbott's opening statement during the California limitations trial to avoid acknowledging that, in fact, their delay in filing their claims left Abbott with no alternative but to "go by what Mrs. Dotegowski claims" for the purposes of pursuing its limitations defense.  (Ex. 21, 8/18/15 *Dotegowski* SOL Trial Tr. at 87:9-24 (explaining that Dr. Kaplan's medical records were destroyed four years before Plaintiffs filed suit due to his seven-year document retention policy); *id.* at 89:3-7 ("the shame of this is, we are going to have to accept for this case…what she says"); *id.* at 89:25-90:5 ("[The medical records] would have been real valuable to you – valued by you in assessing this dispute, but we don't have them.  We have to go by what Mrs. Dotegowski claims.").  In closing, Abbott's counsel similarly did not agree with Mrs. Dotegowski's position, but maintained that the jury should hold Mrs. Dotegowski to her testimony for purposes of resolving the limitations issue presented at trial.[10]  Explaining why jurors should find in a party's favor—even if an opposing party is telling the truth—is what advocates do, not the basis for judicial estoppel.

In isolating the issue in this way, Judge Karnow was attempting to avoid "slop-over prejudice" that would result from considering evidence of Plaintiffs' liability claims during the

---

[10] (*See* Ex. 22, 8/21/15 *Dotegowski* SOL Trial Tr. at 374:5-9.)  During a pretrial deposition, Mrs. Dotegowski repeatedly testified that Dr. Kaplan did not warn her about the birth defect risks of Depakote before Emily was conceived.  (Ex. 3, 8/23/12 M. Dotegowski Dep. at 108:6-12, 110:2-5, 229:23-230:5.)  Dr. Kaplan subsequently testified that he would have warned her about those risks if he had prescribed Depakote for her.  (Ex. 11, 4/12/14 Kaplan Dep. at 83:23-84:2, 84:15-85:2, 86:24-87:13.)  During the California limitations trial, Mrs. Dotegowski traveled to San Francisco to acknowledge, under oath, that, if Dr. Kaplan testified that he warned her, he did.  (Ex. 19, 8/20/15 *Dotegowski* SOL Trial Tr. at 266:15-267:13.)

California limitations trial.  (*See* Ex. 23, 1/9/15 *Dotegowski* Hearing Tr. at 59:3-60:1 ("isolating an issue gets rid of [Cal. Civ. Code 352] slop-over prejudice is what it does…And slicing something out actually has a benefit of focusing on that one issue.").  *See also, e.g., Urland*, 822 F.2d at 1275 (rejecting plaintiffs' challenge to trial court's instruction that a jury was to assume that defendant's conduct was false and misleading and barring plaintiffs' evidence about that topic, because district court "could have reasonably decided not to embark on the complex issue of whether, in fact, Merrell-Dow had concealed relevant and damaging test results in the context of the threshold decision of the statute of limitations"); *Burgess-Lester*, 2007 WL 3088082, at *1 (N.D.W. Va. Oct. 22, 2007) (bifurcation would avoid prejudice against defendant by severing defendant's limitations defense from liability, causation, and damages issues).  Plaintiffs' attempt to use the California limitations trial to dilute their burden to prove that Mrs. Dotegowski took Depakote when Emily's spina bifida occurred would have this Court swap out evidence for the very "slop-over prejudice" that Judge Karnow sought to prevent.

Lest there by any doubt about whether Abbott had any choice but to avoid presenting evidence and arguing about whether Mrs. Dotegowski took Depakote when Emily's spina bifida occurred, the Court need look no further than Judge Karnow's Order sanctioning John Eddie Williams for his actions during the California limitations trial.  (Ex. 18, 9/29/15 Order Imposing Sanctions on John Eddie Williams.)   Judge Karnow sanctioned Mr. Williams for arguing liability-related matters, finding it "clear that Mr. Williams sought to have the jury decide the statute-of-limitations case on impermissible grounds, i.e. on the basis that (a) Abbott was guilty of misdeeds and (b) a verdict in its favor in Phase 1 would unfairly bar Emily Dotegowski from her 'day in court,' blocking consideration of those alleged misdeeds."  (*Id.* (sanctioning Mr. Williams for "causing multiple, reasonable motions for mistrial").)   Abbott was likewise

29

prohibited from addressing merits-related issues during the California limitations trial and should not be punished for not committing contempt of Judge Karnow's Court.

By Plaintiffs' twisted logic, the California limitations trial forced Abbott to choose between (1) arguing that Mrs. Dotegowski never took Depakote during her pregnancy, thereby running the risk of sanctions during proceedings before Judge Karnow and (2) pursuing its limitations defense, but losing an alternative defense (no product use) that it has pursued for years.   Judicial estoppel, Judge Karnow, and governing law imposed no such Catch-22 on Abbott.

### D.   Conclusion

So, in brief, here is the situation: For five-plus years, Plaintiffs litigated their New-Jersey-based claims in a California court, a California jury found for Abbott during a statute of limitations trial, and a final judgment was entered against Plaintiffs.   When Plaintiffs re-filed their claims in this Illinois Court and Abbott moved to dismiss those claims, Plaintiffs successfully persuaded this Court to rule that the California judgment "did not reach the merits of" their product liability claims.   (10/19/16 Order (Doc. 12), at 6.)   Now that an Illinois jury might reach the most fundamental element of Plaintiffs' claims—Did the plaintiff use the defendant's product?—Plaintiffs ask this Court to rule that the California trial proceedings, verdict, and judgment already answered that question.

The law, equity, and common sense do not stomach such a result.   If Plaintiffs cannot prove that Mrs. Dotegowski took Depakote when Emily's spina bifida occurred, they should not prevail.   Judicial estoppel provides no means for Plaintiffs to evade their burden of proof, swap the evidence that New Jersey law requires for the "slop-over prejudice" that Judge Karnow

prevented, or transform their loss in California into an easier case in Illinois.   Plaintiffs' substance-less grasp for strategic advantage should be denied.

**Plaintiffs' MIL #4**

Plaintiff Emily Dotegowski moves to exclude any argument, inference, evidence or suggestion that Mrs. Dotegowski's 750 mg/day dose of Depakote was "low" and/or was safe or otherwise incapable of causing Plaintiff's birth defects. Plaintiff anticipates Abbott will argue that Mrs. Dotegowski's dose of Depakote was "low" and insufficient to cause Plaintiff E.D.'s injuries. *See, e.g.,* Abbott's Motion to Exclude Certain Testimony of Olaf Bodamer, M.D. (Dkt. No. 23). Such argument, inference, evidence or suggestion is baseless, unfounded, and would only serve to mislead, confuse, and prejudice the jury.

At the outset, any argument that Mrs. Dotegowski's dose of Depakote was too "low" to cause Plaintiff's injuries should be barred as it contradicts Abbott's admissions made pursuant to Rule 36 of the Federal Rules of Civil Procedure.  Indeed, Abbott's stated <u>admission</u> in response to FED. R. CIV. P. 36 requests for admission is that "no minimum therapeutic dose has been identified for which Depakote does not pose any risk of birth defects to women of childbearing years." Ex. D, Abbott Response to Consolidated Plaintiffs' Request for Admission No. 211.

Under Rule 36(b), a "matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  Abbott has filed no motion to withdraw the admission.

This admission is further supported by the admissions of Abbott's corporate representatives who have testified under oath that there is <u>no safe dose</u> of Depakote (*e.g*, no dose at which it has been shown not to cause birth defects).  As Abbott Vice President, Tracey Heimberger, M.D. testified on the subject of dose:

Q:  Does valproic acid cause birth defects in children at all doses?

A:  As far as I'm aware, I'm not aware of any data that says that at some lower dose it does not cause birth defects. So that's my understanding.

\*\*\*

Q.  You know of no safe dose?

A. That's correct.

Ex. E, Trial Testimony of Dr. Heimberger in *Raquel* at 718:17-719:1; *see also* Ex. F, Excerpts from the Deposition of Richard Tresley ("Tresley Dep.") at 273:4-10 ("We could not identify a dose at which there was no risk for a major congenital anomaly.").

Further, outside the courtroom, Abbott has told doctors in its published Depakote label that the 10.7% major malformation rate of Depakote (which includes spina bifida) is "in the offspring of women exposed to an <u>average of 1,000 mg/day</u> of valproate monotherapy during pregnancy <u>(dose range **500**-2000 mg/day)."</u>   *See e.g*., Ex. G, May 2013 Depakote Label (emphasis added).  Mrs. Dotegowski took 750 mg of Depakote, within Abbott's own publically-stated "dose range."

The entire purpose of serving requests for admission is to narrow the issues for trial. Plaintiffs served a request for admission and Abbott admitted that there is no known dose at which Depakote does not cause birth defects.  Its corporate representatives likewise have admitted that the drug causes birth defects at all dose levels.  Abbott has not filed a request to amend or correct its admission.  The matter being conclusively established, Abbott cannot now come in take the position that the dose in this case was too low to cause a birth defect.

**Abbott's Response to MIL #4**

This Court should allow evidence, testimony, argument, and other references to the dose-response relationship of Depakote to birth defects (particularly spina bifida) because (1) Abbott's discovery response, the testimony of Dr. Heimberger, and the testimony of Dr. Tresley are not nearly as broad as Plaintiffs suggest and (2) such references are relevant to disputed causation issues that the Court should not take from the jury.  Plaintiffs' Motion is another attempt—the second in a row—to prevent the jury from evaluating the credibility of Mrs. Dotegowski's testimony that she took Depakote when Emily's spina bifida occurred and to lighten their burden to prove that Emily's spina bifida resulted from her exposure to Depakote.

As a preliminary matter, Abbott's discovery response and the quoted deposition testimony say nothing about Mrs. Dotegowski, Emily, or spina bifida, the specific birth defect for which Plaintiffs seek damages.  For example, Abbott's discovery response provides that "no minimum therapeutic dose has been identified for which Depakote does not pose *any risk of birth defects* to women of childbearing years."  (Pls.' Ex. D (emphasis added).)  Plaintiffs cannot distort the plain language of that discovery response to excuse their burden to prove, among other things, that Mrs. Dotegowski took Depakote when Emily's *spina bifida* occurred, that dosage could cause Emily's *spina bifida*, and Emily's *spina bifida* did result from prenatal Depakote exposure.  That discovery response also says nothing about the other risk factors that Mrs. Dotegowski had for having a child with spina bifida in 1997-98 (e.g., family history of neural tube defects, folate deficiency, obesity).  These are all matters for the jury to consider.

Even if Plaintiffs could find some basis for the jury to find that Mrs. Dotegowski took Depakote when Emily's spina bifida occurred, jurors should still know and understand the dose-response relationship between Depakote and spina bifida to resolve disputed causation issues in this case.  Plaintiffs' only causation expert, Dr. Olaf Bodamer, opines that Emily's spina bifida

resulted from Depakote, an opinion that rests on the premise that because doses above 1000 mg/day have been associated with spina bifida, doses of 750 mg or less can cause spina bifida. Given the lack of scientific evidence and methodology employed by Dr. Bodamer to reach that opinion,[11] Plaintiffs would have the Court exclude dose-response evidence in an attempt to associate, incorrectly, all spina bifida with Depakote. This correlation is misleading, particularly since Dr. Bodamer admits that "upwards of 98 or 99 percent of spina bifida in" the United States "is not caused by Depakote." (Ex. 24, 6/28/14 Bodamer Dep. at 51:16-20.)

Plaintiffs' experts also have conceded the importance of understanding a dose-response relationship for determining disputed causation issues in this case. (*See* Ex. 24, 6/28/14 Bodamer Dep. at 11:12-15 (testifying that "the link between valproic acid and spine bifida [is] dose-dependent"); *id*. at 11:22-12:1 (agreeing that "at higher doses there is more of a risk, and at lower doses of valproic acid there's less of a risk"); *id*. at 119:19-24 (for Depakote to have "anything to do with Emily's spina bifida, Mrs. Dotegowski would have had to use Depakote in sufficient dosage between" time of Emily's conception and May 10, 1998); Ex. 25, 8/12/15 Bodamer Dep. at 53:21-54:4 (testifying that if one had 100 women taking 1000 milligrams of Depakote, risk of spina bifida "would be less than 1 percent"); *see also* Ex. 26 3/30/15 Oakley Dep. at 109:3-110:6 (agreeing during trial in *Forbes v. Abbott Laboratories Inc.* (another bipolar case) that 750 milligrams is "on the lower end of what might be an effective dose for treatment" of "anybody"); *id*. at 112:6-9 (admitting that he does not "know specifically" "what the degree of increased risk is at 750 milligrams with respect to spina bifida"); *accord* Ex. 27, 6/2/14 Graham Rpt. at 13-14, ¶ 30 (defense expert discussing dose-response relationship); *see also id*. at 17, ¶ 37

---

[11] Abbott's Motion to Exclude Dr. Bodamer (Doc. 23) discusses the reasons why the Court should exclude Dr. Bodamer's opinion that Depakote caused Emily's spina bifida and esotropia for lack of sufficient data and reliable methodology. Abbott incorporates that discussion as if fully set forth herein.

("Exposures to teratogens usually follow a toxicological dose response curve.  There is also a threshold exposure level, below which no effect will be observed"); *id*. at 19-20, ¶ 42 (discussing 1,000 mg/day threshold dose).)  Such evidence is relevant of course, as "a plaintiff must show the minimum level of exposure that is capable of causing injury (general causation) and that any opinion on specific causation must state that plaintiff's level of exposure met this minimum."  *In re: Lipitor (Atorvastatin Calcium) Mktg.*, 2015 WL 6941132, at *5 (D.S.C. Oct. 22, 2015) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263-64 (4th Cir. 1999)); *see, e.g., In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,* 524 F. Supp. 2d 1166, 1174 (N.D. Cal. 2007) (stating "dose matters"); *In re Accutane Prod. Liab.,* 511 F. Supp. 2d 1288, 1293 (M.D. Fla. 2007) ("[a]n expert who ignores the dose-response relationship casts suspicion on the reliability of his methodology").

These issues directly affect Plaintiffs' ability to satisfy their burden of proof.  The parties do not dispute that, if Mrs. Dotegowski was taking Depakote when Emily's spina bifida occurred, she took no more than 750 mg per day.  The Court should exclude Dr. Bodamer's opinion that this was a sufficient dose to cause Emily's spina bifida.  (*See* Def.'s Mot. to Exclude Certain Opinion Testimony of O. Bodamer, M.D. (Doc. 23).)  At the very least, it is critical that the jury consider his unreliable opinion, if at all, in light of the scientific evidence underlying that opinion.  Several researchers have concluded that, when spina bifida is associated with prenatal Depakote exposure, it occurs when patients take more than 1,000 mg/day:

- "At doses below 1100 mg/day, [Depakote] was not statistically significantly associated with more [fetal malformations] than in unexposed foetuses."  (Ex. 28, F. Vajda, et al., *Foetal Malformations and Seizure Control: 52 Months Data of the Australian Pregnancy Registry*, 13 European J. of Neurology 645, 648 (2006) (bracketed alterations made).)

- "[T]he rate of [foetal malformations] (3.3%) when the dose was <1100 mg/day was similar to that in the drug-free group."  (Ex. 29, F. Vajda, et al., *Critical Relationship between Sodium Valproate Dose and Human Teratogenicity: Results of the Australian*

35

*Register of Anti-epileptic Drugs in Pregnancy*, 11 J. CLIN. NEUROSCI. 854, 857 (2004) (bracketed alterations made).)

- "There was a cut-off value in [Depakote] dose (1000 mg/day) and level (70ųg/ml) for the occurrence of malformations in offspring exposed to a single AED while there was no such value in the remaining AEDs in the monopharmacy as well as the polypharmacy groups. . . .  With regard to [Depakote] dose and level or the [drug score] (in polypharmacy cases), these cut-off values can be a good clinical guideline for AED treatment of women with epilepsy of child-bearing age."  (Ex. 30, S. Kaneko, et al., *Congenital Malformations Due to Antiepileptic Drugs* 33 Epil. Research 145, 155-56 (1999) (bracketed alterations made).)

- "With daily doses <1,000 mg/d, no spina bifida was observed (0/54)."  (Ex. 31, Juliette G.C. Omtzigt et al., *The Risk of Spina Bifida Aperta after First-Trimester Exposure to Valproate in a Prenatal Cohort*, 42 NEUROLOGY 119, 122 (1992).)

There is no reason to keep such scientific evidence from the jury.  To exclude it would only (1) mislead the jury into believing that there is scientific support for the contention that 750 milligrams can cause spina bifida, a notion that not even Dr. Bodamer can support; (2) encourage the jury to assume that low dose Depakote did cause Emily's spina bifida rather than evaluate the evidence presented; and/or (3) unfairly prejudice Abbott's defense by lightening Plaintiffs' burden to prove causation.  The Court should deny Plaintiffs' Motion.

## Plaintiffs' MIL #5

Plaintiff Emily Dotegowski moves to exclude evidence, inference or suggestion that other factors may or could have caused or contributed to Plaintiff's injuries.  Abbott's causation experts have admitted that spina bifida, a birth defect suffered by Plaintiff, can be a "multifactorial" defect with more than one contributing cause.  *See* Ex. I, Deposition of Dr. Anthony Scialli ("Scialli Dep.") at 57:6-10. *See also* Ex. H, Deposition of Dr. John M. Graham ("Graham Dep") at 33:2-6, 33:10-14. And, both of Abbott's experts have stated that Depakote was a factor in causing Plaintiff's injuries:

> Q. […] In other words, there are a number of factors at play in this case and Depakote is one of them?

36

A. I think that's correct assuming Ms. Dotegowski took Depakote during the appropriate time in pregnancy.

Ex. I, Scialli Dep. at 64:24-65:1; *see also* 67:3-11

Q. […] If we define "factor" as something that is not a trivial factor, would you agree that Depakote is a factor among others in the causation of [Emily Dotegowski's] spina bifida?

…

A. I considered it a factor among the others. That's true.

Ex. H, Graham Dep. at 86:14-20.

Likewise, Dr. Maureen Fee, a neurodevelopmental pediatrician who specializes in treating children with spina bifida and other disabilities, and who has treated Emily Dotegowski for many years, testified that Depakote exposure was a factor in causing her spina bifida.  Ex. J, Deposition of Dr. Maureen Fee at 126:1-23 (Depakote is a "known contributing factor"); *see also* 198:15-199:02

In light of the fact that both Illinois and New Jersey law requires Plaintiff to prove only that Depakote was <u>a</u> "substantial factor" or <u>a</u> cause of Emily Dotegowski's injuries, Abbott should not be permitted to introduce evidence or argument about alternative causes.  Even if there were other alleged potential contributing factors to this multifactorial injury, if Depakote was nonetheless <u>a</u> substantial factor, causation is established despite the existence or nonexistence of other alleged factors.  Thus, presenting any argument or evidence to the jury regarding alternative causes is simply irrelevant under the circumstances of this case.

Further, this evidence bears a serious risk of confusing or misleading the jury.  The jury may be lead to think, for example, that they must be certain that Depakote was the cause, the only cause, or that the existence of other potential factors exonerates Abbott from liability, which it does not under Illinois or New Jersey law.

Second, although Plaintiff asserts above that this evidence should be excluded in its entirety, if it is not Plaintiff expects that Abbott will offer alleged alternative causes that are speculative and not supported by reliable evidence. *See United States v. Glover*, 479 F.3d 511, 517 (7th Cir. 2007)( To be admissible, expert testimony must be both "relevant and reliable."). These are:

- That Maryanne Dotegowski did not take folic acid during pregnancy and that an alleged lack of folate contributed to Emily Dotegowski's neural tube defects or other injuries. There is no evidence that folic acid can prevent or minimize the risk of spina bifida in a fetus exposed to Depakote. Ex. I, Scialli Dep. at 54:2-7; Ex. H, Graham Dep. at 96:15-97:12.

- That Maryann Dotegowski was prescribed opioids, though there is no proof she actually ingested any during pregnancy or that such use could cause Emily Dotegowski's injuries. Ex. H, Graham Dep. at 125:9-17, 161:15-18.

- That Maryann Dotegowski was obese and/or that her weight contributed to Emily Dotegowski's injuries. Ex. I, Scialli Dep. at 52:6-12.

- That Maryann Dotegowski suffered from gestational diabetes during pregnancy and/or that the gestational diabetes contributed to Plaintiff's injuries. Ex. I, Scialli Dep. at 45:10-46:9; Ex. H, Graham Dep. at 140:18-22, 144:23-145:4

- That Maryann Dotegowski suffered from "stress" and that her stress contributed to Emily Dotegowski's injuries. Ex. H, Graham Dep. at 125:18-126:16, 130:3-10.

- That Maryann Dotegowski's family history or genetics[12] were a cause of Emily Dotegowski's injuries, including that Plaintiff may have had a cousin with anencephaly. Ex. I, Scialli Dep. at 69:23-71:11; Ex. H, Graham Dep. at 113:6-14, 114:9-15, 115:3-18, 116:15-118:13, 119:24-120:6.

---

[12]   In particular, there is no basis for Abbott to suggest that Plaintiff's injuries were caused by genetics, have a genetic origin, or are of a genetic etiology. Abbott has not provided any actual evidence to support this assertion, nor would it matter in light of the substantial factor test discussed above. To the extent Abbott is arguing that certain genes leave one more susceptible to the birth defects caused by Depakote, this is likewise inadmissible. Defendants are responsible for any harm caused to a plaintiff regardless of any preexisting predisposition or condition. Thus, whether Mrs. Dotegowski's genetic disposition may make her offspring more apt to suffer from spina bifida is unsupported by any medical evidence, irrelevant, unfairly prejudicial, and calculated to mislead and confuse the jury. *See* FED. R. EVID. § 403.

There is no evidence to support these alleged alternative factors or causes or that these contributed in any way to Plaintiff's injuries. *See, e.g.,* Expert Report of Olaf Bodamer, M.D. at *13-14. This evidence should therefore be excluded under FED. R. EVID. 401 and FED. R. EVID. 403 as irrelevant, unfairly prejudicial and calculated to mislead or confuse the jury. Argues.

### Defendants' Response to MIL #5

Plaintiffs' Motion to prohibit evidence, testimony, argument, and other references to certain causes or contributing factors to Emily's spina bifida—their third consecutive effort to dilute their burden to prove causation—is not new to this litigation.  It has been filed five times previously in the Depakote litigation.  The results have been the same every time—each court has denied plaintiffs' efforts to exclude evidence of alternative causes.[13]  Because Plaintiffs have the burden to prove causation, it is well settled that Abbott is entitled to cross-examine Plaintiffs' experts and/or rebut Plaintiffs' theory of causation with evidence of potential alternative causes of Emily's alleged injuries.  Additionally, in this case, Plaintiffs' specific causation expert, Dr. Bodamer, admits that a family history of birth defects and genetics are factors to be considered in a causation analysis for spina bifida.  Plainly, Abbott should not be prohibited from introducing evidence of risk factors that Plaintiffs' own expert admits are relevant.  Plaintiffs' motion should be denied.

Despite the above, Plaintiffs once again ask the Court to foreclose any opportunity for Abbott to defend itself against their allegations that the injuries alleged in this case result from Depakote.  Their arguments all ignore the expert evidence that alternative causes substantially

---

[13] Abbott uses the phrase "alternative causes" without admitting that Mrs. Dotegowski's reported Depakote use could be a significant risk factor for Emily's spina bifida.  The question of whether Mrs. Dotegowski even took Depakote during her pregnancy remains, at best for Plaintiffs, open.

contributed to Emily's spina bifida risk.  The jury should have the opportunity to evaluate evidence concerning the substantial spina bifida risks posed by Emily's family history, Mrs. Dotegowski's lack of folic acid intake[14] during the first trimester of her 1998 pregnancy with Emily, Mrs. Dotegowski's gestational diabetes, her obesity, her stress, and/or her opioid use (collectively, "alternative causes").

### A.  Plaintiffs' arguments have been repeatedly rejected by other courts, and this Court should reject those arguments again.

After careful consideration of Plaintiffs' same arguments in the California proceedings, Judge Karnow ruled that alternative causation evidence was "patently relevant to the substantial cause analysis" and denied Plaintiffs' motion to exclude that evidence.  (Ex. 10, *Dotegowski* MIL Order at 19-20.)  Judge Karnow's ruling is in accord with numerous Depakote cases tried to date.  Although plaintiffs continue to file this motion *in limine*, they have always lost it.  (*See, e.g.*, Order Ruling on Mots. *in Limine*, *Kaleta v. Abbott Labs. Inc.*, No. 14-cv-847 (Doc. 287), at 10 (S.D. Ill. Feb. 20, 2015) (denying plaintiffs' motion to exclude evidence "that something other than Plaintiff's mother's ingestion of Depakote contributed to D.W.K.'s injuries"); Order, *Hutchens v. Abbott Labs. Inc*., No. 14-cv-176 (Doc. 213), at 1 (Jan. 17, 2017) (denying plaintiffs' motions to exclude evidence that Z.H.'s injuries were caused by genetics and to exclude evidence of family history of Down's syndrome) (motions filed under seal); *Rheinfrank v. Abbott Labs.,* 2015 WL 5258858, at *10 (S.D. Ohio Sept. 10, 2015) (denying plaintiffs' request to exclude effect of biological mother's use of phenobarbital during her pregnancy or any

---

[14] Despite Plaintiffs' assertion that "[t]here is no evidence that folic acid can prevent or minimize the risk of spina bifida in a fetus exposed to Depakote," *see supra* at 38, the Center for Disease Control affirms that "folic acid is a B vitamin" which "can help prevent major birth defects of the baby's brain and spine (anencephaly and spina bifida)."  CDC website, Facts about Folic Acid, http://www.cdc.gov/ncbddd/folicacid/about.html (last accessed Dec. 11, 2017).

accompanying effect on minor plaintiff's health); Ex. 32, Pretrial Conf. Tr., *Forbes  v. Abbott Labs. Inc.*, No. 12-cv-1760 (E.D. Mo. May 19, 2016), at 6:5-7:15 (denying plaintiffs' motions to exclude evidence of alternative causes and to exclude family history of mental illness as it "likely has to do with her genetic makeup").)  In *Barron v. Abbott Labs. Inc.*, No. 1222-cc02479-01 (City of St. Louis, Mo. May 1, 2015) ("*Schmidt*"), the Honorable Steven R. Ohmer denied a similar motion.  There was no written order in *Schmidt*.

With good reason, this Court, Judge Karnow, and other jurists have denied Plaintiffs' recycled Motion.  Plaintiffs "must prove what is known as 'medical causation' – that [Emily's] injuries were proximately caused by exposure [to Abbott's] product." *James v. Bessemer Processing Co.*, 714 A.2d 898, 908 (N.J. 1998); *see also Wintz by & through Wintz v. Northrop Corp.*, 110 F.3d 508, 515 (7th Cir. 1997) ("it was incumbent on the [plaintiff], as the party with the burden of proof, to come forward with convincing affirmative evidence that exposure to bromide caused [the minor plaintiff's] abnormalities").  A "plaintiff must show that the exposure to … defendants' product was a substantial factor in causing or exacerbating the disease" or injury.  *James*, 714 A.2d at 909.  Courts liberally admit evidence of alternative causes of a plaintiff's alleged personal injury damages[15] and proof that Emily's spina bifida resulted from alternative causes "tend[s] in reason …to disprove" Plaintiffs' causation assertions.  Fed. R. Evid. 401.

---

[15] *See, e.g.*, *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1070 (11th Cir. 2014) (trial court applied wrong legal standard by requiring testimony offered by defendant regarding alternative causes be proved to reasonable medical certainty); *Allen v. Brown Clinic, P.L.L.P.*, 531 F.3d 568, 575 (8th Cir. 2008) (requiring defense experts to testify to probabilities would "impermissibly shift the burden of proof and require a defendant to 'disprove' a plaintiff's theory by a preponderance of the evidence"); *Wilder v. Eberhart*, 977 F.2d 673, 676 (1st Cir. 1992) (medical malpractice defense experts may testify to possible causes of plaintiffs' injuries to rebut expert testimony; such causes "need not be proved with certainty or more probably than not").

Because it is Plaintiffs' burden to prove causation, it is well-settled that if Plaintiffs are entitled to submit expert testimony on causation, Abbott is likewise entitled to address alternative causes, including cross-examining Plaintiffs' experts and/or presenting its own evidence of alternative causes. *See, e.g., Kennedy v. Arronenzia,* 2006 WL 2135712, at *10 (N.J. Super. Ct. App. Div. Aug. 2, 2006) ("On cross-examination . . . asking an expert witness whether other possible sources could have caused a plaintiff's injuries is proper, and evidence as to other possible causes of the injury is admissible."); *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000), *as amended on denial of reh'g and reh'g en banc* (June 1, 2000) ("possibility of Mr. Cooper's [chronic pain syndrome] being attributable to a factor other than the fall is a subject quite susceptible to exploration on cross-examination by opposing counsel"); *see also Hammer v. Residential Credit Sols., Inc.*, 2015 WL 7776807, at *40 (N.D. Ill. Dec. 3, 2015) ("The possibility that a cause other than the defendant's acts was ultimately responsible for the plaintiff's injury is properly left for exploration on cross-examination"); *Nolan v. Weil-McLain*, 910 N.E.2d 549, 563-64 (Ill. 2009) (circuit court erred in preventing defendant from presenting evidence of plaintiff's other asbestos exposures in support of its proximate cause defense, because "the plaintiff exclusively bears the burden of proof to establish the element of causation through competent evidence, and that a defendant has the right to rebut such evidence").

Plaintiffs claim that Abbott, Dr. John Graham, and Dr. Anthony Scialli (a regulatory expert) have admitted that Emily's spina bifida resulted from her Depakote exposure. That is simply not true. The fact that Depakote may have been considered, but ruled out, as a potential factor for Emily's spina bifida, by an expert geneticist and specific causation expert identified by

Abbott (Dr. Graham),[16] merely re-affirms the soundness of his methodology.  Had Dr. Graham never considered the possibility that Depakote even arguably could have caused Emily's spina bifida, Plaintiffs would have undoubtedly challenged his causation opinions as unreliable.[17] Plaintiffs have not lodged and cannot lodge such a challenge, because Dr. Graham considered Depakote, and properly ruled it out, as a potential cause of Emily's spina bifida.

The assertions of Plaintiffs and Dr. Bodamer to the contrary merely raise the prospect of a battle of the experts unless the Court properly excludes Dr. Bodamer's opinion.[18]

---

[16] Dr. Graham "considered [Depakote] as a factor *among the others*." (Ex. 33, 7/8/14 Graham Dep. at 86:14-20 (emphasis added).)  Nothing is irrelevant, unduly prejudicial, confusing, or misleading about Dr. Graham's opinions that the 750 mg or less dose that Mrs. Dotegowski allegedly took when Emily's spina bifida occurred "was not a significant factor in causing" her spina bifida, *id.* at 85:23-86:3; it is *not* his opinion that "that valproic acid may have contributed to spina bifida in Emily," *id.* at 192:14-17; and he ruled out Depakote as a contributing factor in her spina bifida.  (*Id.* at 194:7-9.)

[17] *See, e.g.*, *Creanga v. Jardal*, 886 A.2d 633, 639 (N.J. 2005) ("differential diagnosis that 'rules in a potential cause that is not so capable' or fails to consider a plausible hypothesis that would explain the condition has not been properly conducted" and is unreliable) (citation omitted); *Barwell v. Novartis Pharm. Corp.*, 2014 WL 2573340, at *2, *3 (N.J. Super. Ct. Law. Div. 2014) ("Though an expert need only determine 'which of the competing causes are generally capable of causing the patient's symptoms,' a failure 'to consider a plausible hypothesis that would explain the condition' results in an improperly conducted differential diagnosis;" expert testimony that "did not consider all alternative causes" excluded).

[18] Although Dr. Scialli has testified that Depakote "might" have been "a factor" contributing to Emily's spina bifida, he has not opined or testified that Depakote was the only factor for Emily's spina bifida or was a substantial factor for Emily's spina bifida.  (Ex. 34, 8/29/14 Scialli Dep. at 67:3-11 (did not "know whether the spina bifida would have occurred in the absence of Depakote in this child").)  Dr. Scialli further testified that there were a number of elements, including obesity, diabetes, and genetics, that also may have been "contributing factors" in Emily's spina bifida.  (*Id.* at 69:7-16.)  Even charitably read in Plaintiffs' favor, Dr. Scialli's deposition testimony concerns many of the same potential risk factors that Dr. Graham actually evaluated for Emily, about which Dr. Graham issued an expert report concerning his specific causation evaluation, and about which he did testify during his deposition.

**B.      Evidence of Emily's family history relates to disputed causation matters.**

In addition to allowing references to the fact that the vast majority of spina bifida cases have no known cause, the Court should permit references concerning the contribution of Emily's family history toward her risk of being born with spina bifida.

Emily's treating physicians and at least two of Plaintiffs' retained experts have confirmed the importance of genetics to spina bifida.  According to Dr. Maureen Fee—a treating physician on whom Plaintiffs rely heavily—a combination of many factors or "environmental influences" and the "predisposing gene" "causes that early neural tube to close improperly" in children with spina bifida.  (Ex. 35, 5/15/13 Fee Dep. at 39:24-40:9; *see also* Ex. 36, 3/7/04 Moyer & Anderson Ltr. ("If [Mrs. Dotegowski] were planning another pregnancy, we would still estimate a 2-3% chance of recurrence for an open neural tube defect.  Emily's chance will be about 5% to have a child with an open neural tube defect.  Her brothers and sisters have about a 1% chance."); *see also* Ex. 37, 7/31/98 Naylor & Wapner Ltr. (Mrs. Dotegowski and Emily's father, Michael Dotegowski, were "informed that approximately 10% of [neural tube defects] are caused by an underlying chromosome abnormality").)

At least one of Emily's other family members also has been born with a neural tube defect.  (*See, e.g.,* Ex. 36, 3/7/04 Moyer & Anderson Ltr. ("Your husband's brother also had a child"—Emily's cousin—"with anencephaly (another form of neural tube defect)").[19]  That fact alone increased Emily's birth defect risk by "approximately two percent."  (Ex. 35, 5/15/13 Fee Dep. at 44:18-45:7; *see also, e.g.,* Ex. 27, 6/2/14 Graham Rpt. at 29-30, ¶¶ 56, 58.)

---

[19] "Anencephaly is a serious birth defect in which a baby is born without parts of the brain and skull. It is a type of neural tube defect (NTD)."  CDC website, Facts about Anencephaly, http://www.cdc.gov/ncbddd/birthdefects/anencephaly.html (last accessed: Dec. 11, 2017).

The foregoing testimony is among the many acknowledgements by Plaintiffs' experts, Plaintiffs' treating doctors, and Abbott's own expert that multiple factors play a role in a mother's predisposition to having a child with spina bifida.  Abbott is entitled to address these medical facts, including exploring on cross-examination whether Plaintiffs' experts appropriately considered the genetic, environmental, and other risk factors in opining on causation issues.  *See Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010); *Nolan*, 910 N.E.2d at 563-64.  The jury has the discretion to accept or reject all of Plaintiffs' expert opinion testimony if it finds that they have failed to account for alternative risk factors.  *See, e.g.*, *U.S. v. Lacy*, 2006 WL 3486825, at *2 (N.D. Ill. Nov. 30, 2006) (after hearing basis for expert opinion, jurors "were entitled to accept or reject that opinion").  Any dispute about a potential factor goes to the weight, not the admissibility, of the evidence.  *See Cooper*, 211 F.3d at 1021 ("[Defendant]'s contention that other conditions of Mr. Cooper's might have caused his CPS goes to the weight of the medical testimony, not its admissibility").

### C.    Mrs. Dotegowski's not taking folic acid during her first trimester relates to disputed causation matters.

Plaintiffs' retained experts also admit that folic acid supplementation can decrease spina bifida risk and a lack of folate can cause spina bifida.  (Ex. 24, 6/28/14 Bodamer Dep. at 82:22-84:4; Ex. 38, 2/21/14 Oakley Dep. at 43:12-44:4.)  Unable to attack Dr. Graham's consideration of Mrs. Dotegowski's lack of early folic acid supplementation as a potential cause of Emily's spina bifida, Plaintiffs argue that folic acid cannot prevent or minimize the risk of spina bifida in a fetus exposed to Depakote.  (*See supra* at 38.)  Plaintiffs have assumed too much: the question of whether Mrs. Dotegowski did or did not take Depakote during her pregnancy with Emily remains disputed.  (*See supra* 12.)

Furthermore, as Dr. Graham has opined, Depakote was not a factor or a "substantial factor" in causing Emily's spina bifida.  (Ex. 33, 7/8/14 Graham Dep. at 85:23-86:3, 192:14-17, 194:7-9.)  The low dose of Depakote that Mrs. Dotegowski allegedly took does not cause spina bifida, much less Emily's, in light of the host of alternative causes in play during her mother's pregnancy.  (*Id.* at 36:24-38:17, 161:12-13.)

> **D.    Mrs. Dotegowski's obesity before and during her pregnancy with Emily relates to disputed causation matters.**

As Plaintiffs all but disregard Dr. Graham's opinions, report, and deposition testimony concerning the contributions of Mrs. Dotegowski's weight to Emily's increased risk of being born with spina bifida, the Court should deny that portion of their Motion.  To the extent that further consideration is even necessary, Dr. Graham's deposition testimony and report provide that support: "[Mrs. Dotegowski] has obesity of significant proportions, which at least doubles the risk."  (Ex. 33, 7/8/14 Graham Dep., at 156:18-20.)  Dr. Graham's report is replete with citations to support obesity—with or without comorbidities, such as diabetes—as a cause of birth defects, major malformations, and in particular Emily's spina bifida.  (*E.g.,* Ex. 27, 6/2/14 Graham Rpt. at 5, ¶ 14; 12-13, ¶ 28; 13-14, ¶¶ 29-30; 14, ¶ 31; 29, ¶ 56; 31-32, ¶ 61; 32, ¶ 62.)

Dr. Bodamer likewise acknowledges that "[o]besity in a mother is a risk factor for spina bifida."  (Ex. 24, 6/28/14 Bodamer Dep. at 28:12-14.)  If admitted at all, his specific causation opinions are subject to cross-examination and should be evaluated in light of the significant medical evidence that obesity contributes to spina bifida risk.  *See, e.g.*, *Hammer*, 2015 WL 7776807 at *40; *Nolan*, 910 N.E.2d at 563-64.

> **E.    Mrs. Dotegowski's diabetes relates to disputed causation matters.**

Dr. Graham also has identified diabetes as an alternative cause of birth defects, including spina bifida generally and Emily's specifically.  (*See, e.g.*, Ex. 27, 6/2/14 Graham Rpt. at 5, ¶ 14;

13-14, ¶ 30; 29, ¶ 56; 31-32, ¶ 61.)  Drs. Bodamer and Oakley acknowledge that same, general spina bifida risk.  (Ex. 24, 6/28/14 Bodamer Dep. at 28:15-17; Ex. 38, 2/21/14 Oakley Dep. at 46:18-47:13.)

Plaintiffs contend, however, that there is no medical record evidence supporting a claim that Mrs. Dotegowski had diabetes when Emily's spina bifida occurred.  But that argument overlooks the testimony of Beverly Winter, who believes that Mrs. Dotegowski took "diabetes medicine" while purportedly taking Depakote.  (Ex. 39, 4/25/14 Winter Dep. at 61:7-18.)

Plaintiffs instead focus their challenge on Dr. Graham's acknowledgment that no blood glucose readings from the critical, early part of Mrs. Dotegowski's pregnancy are available.  (*See* Ex. 33, 7/8/14 Graham Dep. at 140:18-22, 144:23-145:4.)  Dr. Graham nonetheless concluded that diabetes was a factor contributing to Emily's spina bifida risk based on other circumstantial evidence, such as Mrs. Dotegowski's history of gestational diabetes; her use of Prednisone, which "could have contributed to worsening of her glucose control"; Mrs. Dotegowski's eventual need for insulin during her pregnancy with Emily; and the fact that Mrs. Dotegowski was overweight, likely becoming more obese and diabetic with her advancing maternal age (39, when Emily was conceived and born).  (*See id*. at 37:20-38:8, 145:5-146:5, 153:17-155:12; *see also id.* at 155:1-12 (discussing adult onset diabetes mellitus: "By the time they get to be in their middle ages – meaning early 40s, late 30s – that, it's in the cards for that to develop, it develops").)

### F.    Mrs. Dotegowski's opioid use relates to disputed causation matters.

Plaintiffs' claim that there is no support for Mrs. Dotegowski's opioid use during her pregnancy with Emily is unfounded.  If evidence concerning Mrs. Dotegowski's use were to be excluded on the grounds that there is "no proof [Mrs. Dotegowski] actually ingested [opioids]

during pregnancy," *supra* at 38, the Court also would have to exclude evidence of Mrs. Dotegowski's alleged Depakote use because there similarly is no proof of such use.

There is at least one difference, however, between the medical evidence concerning Mrs. Dotegowski's opioid use and her reports of taking Depakote in early 1998.   Unlike Mrs. Dotegowski's later reported Depakote use, an early 1998 medical record documents that Mrs. Dotegowski was given Percocet (oxycodone), an opioid, and was supposed to use that medication for abdominal wall pain so painful that Mrs. Dotegowski sought emergency treatment.   (Ex. 5, 2/28/98 Schwartz Med. Rec. at 271-72; *see also* Ex. 3, 8/23/12 M. Dotegowski Dep. at 201:11-17 ("very, very, very bad," itchy, and "very painful" rash prompted March 1998 hospital visit).)   Dr. Graham's expert opinion is supported by medical record evidence that opioids were prescribed and the prescription was filled during the same spring when Emily was conceived—significantly more "proof" of use than that existing for Mrs. Dotegowski's alleged Depakote use.  (*See* Ex. 33, 7/8/14 Graham Dep. at 50:8-51:12, 54:11-17.)

Plaintiffs further complain that Abbott has produced "no proof" that Mrs. Dotegowski's opioid use "could cause Emily Dotegowski's injuries," *supra* at 38, but Dr. Graham has testified about "the statistically significant association between opioids exposure and certain birth defects of which spina bifida is one." (Ex. 33, 7/8/14 Graham Dep. at 124:25-125:8; *see also, id.* at 45:4-9, 55:6-11, 58:16-21, 60:24-61:9, 65:12-22, 65:24-66:12.)   Dr. Graham's unchallenged opinions are consistent with an article by Broussard, et al. (2011) (cited in Ex. 27, 6/2/14 Graham Rpt. at 13-14, ¶¶ 29-30), in which the authors report "a significant association between maternal opioid use between 1 month before and 3 months after conception with spina bifida." (Ex. 40, Broussard et al. 2011 Am. J. Obstet Gynecol article at 5.)

48

Plaintiffs' argument also fails to account for Dr. Bodamer's acknowledgment that, if Mrs. Dotegowski took opioids during the early part of her pregnancy, those medications "could increase the risk for spina bifida."  (Ex. 24, 6/28/14 Bodamer Dep. at 185:23-186:3.)

**G.    Alternative factors are critical to the jury's assessment of proximate cause.**

These potential alternative causes are not just relevant.  They are also critical because the jury could conclude that, because of other risk factors, Depakote was not a cause-in-fact of the alleged injuries or the jury could conclude that because Plaintiffs' alleged injuries have many causes, it cannot tell whether (or Plaintiffs cannot prove that) Depakote caused the alleged injuries.  In other words, jurors could decide that some other factor(s) caused the alleged injuries or they do not know what caused the alleged injuries, because Plaintiffs did not prove their case by a preponderance of the evidence.

If the Court were to exclude evidence of other factors bearing on, or related to, Emily's risk of being born with spina bifida, the jury could be left with the misimpression that Abbott should have warned that Depakote causes all, most, or at least a substantial portion of spina bifida cases.  Excluding evidence of Plaintiffs' non-Depakote risk factors could mislead the jury into inflating the incidence rate reported in Abbott's Depakote labeling, when, in fact, even Dr. Bodamer concedes a very small number of spina bifida cases occur among those exposed to Depakote *in utero*.

Furthermore, evidence concerning risk factors other than Depakote bears on whether Emily would have been born with birth defects *even if* Mrs. Dotegowski had taken a different medication in lieu of Depakote during her pregnancy.  *See, e.g.*, *James v. Arms Tech., Inc.*, 820 A.2d 27, 39 (N.J. Super. Ct. App. Div. 2003) ("plaintiff must prove 'causation in fact'; that is, the result complained of would not have occurred 'but for' the negligence of defendant");

*Coffman v. Keene Corp.*, 628 A.2d 710, 716 (N.J. 1993) (plaintiff is "required to prove that … injury that had been proximately caused by exposure to defendant's product"); *Scott v. Eli Lilly & Co.*, 2016 WL 1741241, at *2 (N.J. Super. Ct. App. Div. May 3, 2016) (same); *see also, e.g., Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir. 2008) ("Causation-in-fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage, meaning that the injury would not have occurred absent the conduct") (internal quotations omitted).

Even if Plaintiffs' evidence could generate a genuine dispute of material fact on proximate causation—which Abbott submits they cannot—evidence of alternative risk factors will facilitate a reasonable juror's assessment of these issues.  Genetic, environmental, and other causes can contribute as much (if not more) to the risk of spina bifida than Depakote alone, even in those cases where Depakote is argued to contribute to the spina bifida.  These facts are critical to the assessment of proximate causation.

Finally, Plaintiffs' argument that alternative causes are irrelevant because they need prove only that Depakote was "a" proximate cause is a red herring.  In order for the jury to assess whether Depakote was a proximate cause, it must be presented with other potential causes.  Where "there are multiple possible causes" of the injury, a plaintiff's expert is still required to provide some analysis of why she concluded that the medicine was "a substantial factor" contributing to the plaintiff's alleged injury.  *McHugh v. Jackson,* 2010 WL 1875578, at *2 (D.N.J. May 7, 2010).

Accordingly, without evidence about all potential risk factors for the damages that are attributed to Depakote, the jury would be hamstrung in its efforts to gauge the credibility of Plaintiffs' experts and the methods by which they reached their conclusions.  This would be

unfairly prejudicial.  The exclusion of such evidence also would inappropriately lower Plaintiffs' burden to prove that their alleged damages resulted from Emily's alleged prenatal Depakote exposure.  Simply put, if the jury is presented with no risk factors for birth defects other than Depakote, their role as a fact-finder is usurped.

For these reasons, Plaintiffs' motion should be denied.

## Plaintiffs' MIL #6

Plaintiffs move to exclude any comment, evidence, testimony, argument, or inference regarding Plaintiff's decision to call or not to call a witness live at trial; specifically, but not limited to, any of Plaintiff's family members, Maryann Dotegowski's treating physicians, and Plaintiff's treating physicians. It is axiomatic that a party cannot "argue to the trier of fact that an adverse inference should be drawn from another party's failure to call a witness," unless the complaining party can "establish that the missing witness was peculiarly in the power of the other party to produce." *Oxman v. WLS*-TV, 12 F.3d 652, 661 (7th Cir. 1993). This can be shown if: (1) "the witness is physically available only to [plaintiff];" or (2) "the witness has a relationship with [plaintiff] that practically renders his testimony unavailable to the [defendant]." *Id.* Neither of these circumstances apply to any potential witnesses in this case. Additionally, Federal Rule of Civil Procedure 32(a)(4)(B) allows the use of deposition testimony at trial if the witness is more than 100 miles from the place of hearing trial. FED. R. CIV. P. 32(a)(4)(B). Because Abbott cannot establish the factors above, such arguments are irrelevant, unfairly prejudicial, and improperly calculated to confuse the jury. *See* FED. R. EVID. 403.

## Abbott's Response to Plaintiff's MIL #6

Neither side should comment on a party's decision to call an expert witness at trial.  That has been the practice of both parties in this case.  As to non-retained experts or other witnesses, Abbott submits that the decision should be reserved until the time of trial.

51

**Plaintiffs' MIL #7**

Plaintiffs move to exclude any evidence, argument, and testimony regarding the alleged fault of Maryann Dotegowski, including (1) her alleged knowledge of Depakote's risks prior to her pregnancy with Plaintiff or (2) any allegations that she was somehow negligent in taking or using Depakote. Judge Yandle recently excluded such information in the *Bartolini* case:

> The issues in this case revolve around whether or not Defendant adequately warned Stacy Bartolini's prescribing physicians. As such, any knowledge she may have had regarding any risks associated with the use of Depakote, other than that which she gained from her prescribing physician is irrelevant immaterial and will likely serve to confuse the jury.

*Bartolini* MIL Order at *4. As discussed below, such information should similarly be excluded in this case.

Plaintiffs anticipate that Abbott will seek to introduce evidence, argument, or testimony about Mrs. Dotegowski's alleged awareness of birth defect risks of Depakote or other drugs used to treat her condition. Such evidence is irrelevant. It does not bear on the central questions being resolved here. No issue will be submitted to the jury as to non-physician Mrs. Dotegowski's alleged knowledge of risks, and no issue will be submitted as to whether she as a patient (as opposed to physicians) was or was not adequately warned. Indeed, both Illinois and New Jersey courts have adopted the learned intermediary doctrine, which benefits Abbott in that Abbott need only adequately warn a physician directly. The central questions in this case therefore turn on whether Abbott provided an adequate warning to Mrs. Dotegowski's **prescribing physicians**. *See, e.g., Leesley v. West,* 518 N.E.2d 758, 760 (Ill. Ct. App. 1988); *Perez v. Wyeth Labs.,* 734 A.2d 1245, 1250 (N.J. 1999). What Mrs. Dotegowski was told about risks is legally irrelevant.

The learned intermediary doctrine alleviates Abbott from having a responsibility to warn patients for the precise reason that patients like Mrs. Bartolini generally are not qualified to

weigh the risks and benefits of prescription drugs.   Indeed, they are legally prohibited from obtaining their own prescription for drugs like Depakote and must seek the guidance of a licensed physician.   It would be absurd for Abbott to have the benefit of this doctrine – and therefore have no duty to warn Mrs. Dotegowski directly – but still be allowed to put on evidence of her alleged knowledge of risks of the drug.   Mrs. Dotegowski's knowledge and conduct have no bearing on whether Abbott discharged its duty to warn her prescribing physicians.

Abbott's anticipated trial strategy is aimed at convincing the jury to blame the mother for taking Depakote and getting pregnant, despite the fact that the mother's knowledge or conduct has no legal bearing on what a jury must decide in these cases.   Through experience in past trials, this has become abundantly clear.   Plaintiff anticipates that Abbott will argue that evidence about what the mother knew is relevant because it illustrates or reflects on a prescriber's "knowledge" or what a prescriber may have known about the risks.   This is a red herring. (Even if it were the true basis for relevance, there is ample other evidence of a physician's knowledge without having to get into the irrelevant and prejudicial inquiry of what the non-physician mother was told.)   As illustrated by the following examples from previous Depakote trials, Abbott overtly encourages the jury to impart blame or fault on the Minor Plaintiff's mother:

> From the *Kaleta* Trial
>
> [W]ere dealing with this testimony by Mrs. Kaleta that she can't remember anything now. So, we'll accept that. But it's not a question of whether she remembers it now, it's a question of *whether she knew it full well then*, before she got pregnant with Danny. As this new married couple are talking about having a baby, *fresh from all those warnings about spina bifida and bad birth defects, how could they not discuss that* together? Anyone would. Ex. K at 3187:25-3188:7 (emphasis added).

Mrs. Kaleta testified she can't remember. I don't think it matters. I don't think we need to focus on that because whether she remembers now or not, *it's obvious she knew then*. *Id.* at 3189:20-23 (emphasis added).

From the *Schmidt* Trial

You see, Ms. Vititoe was on Depakote, *but she knew about birth defect risks*, spina bifida risks, with Depakote *and she wanted to get pregnant*. Ex. L, *Schmidt* Trial Transcript *at* 413:13-15 (emphasis added).

*Why did Ms. Vititoe get pregnant with Maddison even though she was aware of the risk* and even though her doctor told her to come talk to him before she gets pregnant? Ms. Vititoe was asked in out-of-court testimony how she got pregnant. She doesn't know. *Id.* at 447:9-15 (emphasis added).

[W]ere there things in her life about her that made it more likely she would be more at risk for having a child with spina bifida that most women. And the answer is yes. *Tiffany Vititoe was more at risk* for having a child with spina bifida. *Not because of Depakote, but because of other things in her life*. And one of them was what her doctors called morbid obesity. *Id.* at 452:25-453:1 (emphasis added).

And Ms. Vititoe herself wanted to go back on Depakote, to get off Lamictal and all its problems, and go back on Depakote, *and she knew the risks when she did that*. *Id.* at 455:17-21 (emphasis added).

From the *Forbes* Trial

[Dr. Mallya] also has testified she knew that risk if Depakote was taken during pregnancy. She also has testified that *she told Mrs. Forbes of that risk*, and even beyond that, she told Mrs. Forbes, '[b]efore you become pregnant while you're on this medicine, make an appointment to see me to talk about your medicines.' *Mrs. Forbes didn't, and she got pregnant*…Mrs. Forbes has said this pregnancy was accidental. She said she had five pregnancies. She said all of them were accidental. Ex. M, *Forbes* Trial Transcript, Volume 1B at 69:14-19; 69:21-23 (emphasis added).

Those are three doctors that Mrs. Forbes saw in the crucial two years leading up to her pregnancy with her son [B.F.]. All three knew the risks that Depakote creates for pregnancy. *All three knew that risk, and Mrs. Forbes was told herself*.[20] *Id.* at 71:19-23 (emphasis added).

---

[20] In the Forbes case, Abbott went so far as to blame Mrs. Forbes' husband as well because he worked in a building in which a copy of the Physicians' Desk Reference could be found.

From the *Raquel* Trial

> Dr. Giese obviously knew about risks. He had her sign the consent form. There is a form at El Hogar that they sign and it says the risks have been explained to me, so obviously, again, he's making a prescription of an increase of a thousand milligrams. *He's going to make sure that she's re-warned* because he knows the risk. Ex. N, *Raquel* Trial Transcript, Volume IIB at 230:16-22 (emphasis added).

> But she knew. *She knew her medications. She knew what she was doing*. She is no shrinking violet when it comes to telling her doctors what she needs to do…So in all three situations she was warned. These doctors knew enough about the risk of this medication not just to say in a deposition, I know about it, but to document in their records three times within 15 days that they actually proposed alternatives, gave warnings. Signed consent forms. It's all right there. *Id.* at Vol. XI, 1693:25-1694:2; 1694:12-17 (emphasis added).

> Now, I've told you, I'm not blaming Ms. Raquel for taking this medication. I want you to understand her. I also want you to understand something else: *She's got a lot to gain by not remembering*. *Id.* at Vol. XI at 1695:2-5 (emphasis added).

These arguments, comments, and implications are entirely irrelevant to the ultimate issue the jury is asked to decide in these cases.  As shown by the relevant jury instruction excerpts below, the jury is never asked to make any judgment about the mother's knowledge or conduct.  Rather, the jury is only asked to evaluate the warnings communicated by Abbott <u>to the relevant prescribing physicians</u>:

- <u>From the *Kaleta* Trial</u>: "[D.K.] has the burden of proving each of the following propositions…Abbott failed to provide adequate warnings or instructions to the physicians who prescribed Depakote to his mother…If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for [D.K.]…"  Ex. O, Excerpt from Final Jury Instructions, *D.W.K., et al., v. Abbott Laboratories, Inc.,* 14-cv-847-NJR-SCW, Dkt. No. 385 at *19 (S.D. Ill. March 20, 2015).

- <u>From the *Schmidt* Trial</u>: "Your verdict must be for [M.S.] if you believe…Abbott did not give adequate warnings or instructions to Dr. Jacoby of the danger to [M.S.] of her birth defects…"  Ex. P, Instruction No. 9, *M.B., et al., v. Abbott Laboratories, Inc.,* 1222-CC-0156 (Mo. Cir. Ct. May 20, 2015).

- <u>From the *Forbes* Trial</u>: "Your verdict must be for [B.F.] if you believe…Abbott

did not give an adequate warning to Dr. Mallya of the dangers of Depakote…" Ex. Q, Instruction No. 9, *B.F., et al., v. Abbott Lab oratories Inc.*, 12-cv-1760-CAS (E.D. Mo. June 3, 2016).

- Underline: From the *Raquel* Trial: "[E.G.] must prove all of the following:…That Abbott failed to adequately warn of the danger or instruct on the safe use of Depakote…The warning must be given to a prescribing physician and must include the potential risks that may follow the foreseeable use of the product. Abbott had a continuing duty to warn Ms. Raquel's physicians as long as the product was in use. Ex. R, *Raquel* Final Jury Instructions, Dkt. No. 313 at *16.

No jury issue has been submitted in any previous trial as to warnings to the mother or as to her potential fault.  Further, to the extent that this evidence is marginally relevant, this relevance is substantially outweighed by the risk of serious prejudice.  The impact of admission of this this irrelevant evidence cannot be overstated, which is precisely why Abbott spends so much effort reinforcing it at trial.   For example, the jury may use this argument to place  blame on Mrs. Dotegowski for taking Depakote and becoming pregnant or be confused or misled as to the actual warnings issues in the case (i.e., whether Abbott's warnings to physicians were inadequate) on which it will be charged at the conclusion of  evidence.

Likewise, any argument, assertion or suggestion that Mrs. Dotegowski is or should be at fault or blamed for Plaintiff's injuries should be barred as irrelevant to the central issues being resolved here.  Such arguments should be precluded as they are red herrings that would only serve to confuse and mislead the jury.  *See* FED. R. EVID. 401, 403. There is no evidence that Mrs. Dotegowski's care of Plaintiff in any way exacerbated or contributed to her birth defects. Indeed, Abbott has not provided any information, discovery responses, expert testimony, or any evidence whatsoever to support a showing that Mrs. Dotegowski was negligent or that she caused Plaintiff's injuries. Abbott's proffered experts do not offer any scientific evidence that any third party contributed to Plaintiff's injuries. Thus, any such evidence would be inappropriate, unfair, and highly prejudicial. These arguments, comments, and implications are

entirely irrelevant to the ultimate issue the jury is asked to decide in these cases. To the extent that this evidence is marginally relevant, this relevance is substantially outweighed by the risk of serious prejudice.

Abbott is well aware of this prejudice and takes advantage of it time and time again. This puts Plaintiff in an unfair position where the jury is being asked to blame his mother even though warnings to her are legally irrelevant, and even though the jury will only be asked about the adequacy of the warnings to her physician. Abbott's "blame the mother" strategy is transparent and should be barred because the prejudice to Plaintiff is substantial.

## Abbott's Response to MIL #7

Abbott will not seek a jury finding that Mrs. Dotegowski was negligent or at fault. That portion of Plaintiffs' Motion is therefore moot.

To the extent their Motion seeks to exclude evidence, testimony, argument, or other references about Mrs. Dotegowski's pre-conception knowledge about the potential birth defect risks of her prescription medicines, her actions in light of that knowledge, or even her lack of knowledge, the Court should deny Plaintiffs' Motion for the same reason that Motion has been denied multiple times in this litigation. Such knowledge is relevant to proximate cause, to establishing the basis for Dr. Kaplan's prescribing decision, and to establishing his knowledge of the spina defect risks of Depakote before Emily's spina bifida occurred.

### A.    Plaintiffs' Motion has been repeatedly denied and should be denied here too.

There is no precedent for excluding evidence of the knowledge, experience, and conduct of the person who used the medicine that is alleged to be defective. In separate Depakote products liability cases, this Court and four other courts have rejected the relief that Plaintiffs seek with their Motion:

- *Raquel*: The Court refused to exclude evidence "of what Christina Raquel was told regarding the risk of birth defects and what her response was to that knowledge," ruling that "the patient's knowledge of the risks and responses to that information are directly connected to the ultimate issue." *Raquel v. Abbott Labs. Inc.*, 2017 WL 2126837, at *2 (S.D. Ill. May 16, 2017).

- *Kaleta*: The Court refused to exclude "factual testimony about what Plaintiffs' mother[,] including her doctors, knew or did not know about the risks of Depakote, the actions and decisions they did or did not take regarding same, and the advice relating to the factual circumstances surrounding the use of Depakote prior to and during pregnancy." (2/20/15 *Kaleta* Memo. & Order (Doc. 287) at 6 n.7.)

- *Forbes*: The court refused to exclude evidence of negligence or fault of the child plaintiff's mother. (*See* Ex. 32, 5/19/16 *Forbes* Pretrial Conf. Tr. at 5:24-6:4.)

- *Rheinfrank*: The court admitted evidence that, a few months after the child plaintiff's birth, the prescribing physician first told the child plaintiff's mother that the alleged birth defects resulted from prenatal Depakote exposure. (Ex. 41, 10/15/15 *Rheinfrank* Trial Tr. at 6-149:6 to 6-150:4.)

- *Schmidt*: The court admitted a medical record indicating that child plaintiff's biological mother was aware of spina bifida risks of Depakote before child's conception. (Ex. 42, 5/21/15 *Schmidt* Trial Tr. at 1591:1-7.)

- *Dotegowski*: During the California limitations trial, Judge Karnow admitted Mrs. Dotegowski's testimony that, if Dr. Kaplan "said that he told" her about the birth defect risks of Depakote, "then I would believe he told me." (Ex. 21, 8/18/15 *Dotegowski* SOL Trial Tr. at 172:13-20.)

Nothing about the trial of Plaintiffs' liability claims in this Court warrants a different result. While Plaintiffs argue that this motion was granted in *Bartolini*, Abbott filed a motion to reconsider that remains pending. (*See* 17-cv-1146 (Doc. 52).) As stated in that motion, Abbott respectfully submits that the Court's ruling in *Bartolini* was in error and contrary to all authority on this issue. Even that decision held that knowledge of risks "gained from [the] prescribing decision" was relevant and admissible.

In assessing the adequacy of the information conveyed by Abbott and whether any alleged inadequacy caused the damages claimed, the jury is entitled to the full context in which

that medicine was prescribed, if at all, for Mrs. Dotegowski, including her knowledge and experience.  This Court should do what it has done in the past and deny this motion.

### 2. Mrs. Dotegowski's knowledge of Depakote's risks is relevant to proximate causation.

The alleged prescribing physician in this case, Dr. Kaplan, did not prescribe the medicine to a blank slate.  If he prescribed Depakote to Mrs. Dotegowski at all, he prescribed the medicine to a patient who was likely aware of the risks of her prescription medications:

- Mrs. Dotegowski had three children prior to Emily, and she "always knew" never to take medications during pregnancy.  (Ex. 3, 8/23/12 M. Dotegowski Dep. at 38:6-11.)

- Mrs. Dotegowski admits the possibility that, in accordance with his customary practice, Dr. Kaplan orally warned her about her risk of having a child with birth defects before she used Depakote to treat her bipolar disorder.  (Ex. 21, 8/18/15 *Dotegowski* SOL Trial Tr. at 172:13-20.)  If Mrs. Dotegowski knew about the risk of birth defects and decided to take that medicine, a jury would be well within its purview to find that the chain of proximate causation has been broken under governing New Jersey law.[21]

- Mrs. Dotegowski potentially received warnings regarding the birth defect risks of Depakote.  Dr. Kaplan recalls that, "in general, the package insert, so to speak, the PDR information was included with samples" distributed in 1997-98.  (Ex. 11, 4/12/14 Kaplan Dep. at 106:13-19.)  If, as Mrs. Dotegowski has sometimes claimed, she received no warnings about the potential birth defect risks of Depakote before Emily's spina bifida occurred, that testimony makes it less likely that she took Depakote at all.  (Ex. 3, 8/23/12 M. Dotegowski Dep. at 108:1-12, 109:17-110:5, 229:20-231:1, 293:4-295:21; Ex. 4, 04/23/14 M. Dotegowski Dep. at 109:14-110:5.)

---

[21] *See, e.g., Fabian v. Minster Mach. Co.*, 609 A.2d 487, 497 (N.J. Super. Ct. App. Div. 1992) ("Preexisting knowledge of danger . . . can negate a claim that absence of a warning was a proximate cause of the injury"); *Vallillo v. Muskin Corp.*, 514 A.2d 528, 531 (N.J. Super. Ct. App. Div. 1986) (when a plaintiff is already aware of the risk, a "warning would give him no more information than he already possessed at the very moment he engaged in the disputed conduct"); *see also McKenzie v. Hawai'i Permanente Med. Grp., Inc.*, 47 P.3d 1209, 1220 (Haw. 2002) ("the scope of the physician's duty may be limited in situations where . . . the patient is already aware of the risk through other means"); *Hondroulis v. Schuhmacher*, 553 So. 2d 398, 413 (La. 1989) ("Risks that are . . . already known to the patient need not be disclosed by the doctor"); *Wilkinson v. Vesey*, 295 A.2d 676, 689 (R.I. 1972) ("Obviously there is no need to disclose risks that are . . . in fact known to the patient"); *Spann v. Irwin Mem'l  Blood Ctrs.* 34 Cal. App. 4th 644, 657-58 (1995) (patient's knowledge of AIDS risk from treatment meant there was no triable issue of fact with respect to causation regarding physician's failure to warn claim).

- As soon as she discovered that she was pregnant with Emily, Mrs. Dotegowski took herself off of Depakote.  (Ex. 3, 8/23/12 M. Dotegowski Dep. at 234:19-235:16.)

- Mrs. Dotegowski is upset with herself for Emily's injuries.  (*Id*. at 44:10-15.)

If tasked with trying to assess the adequacy of the FDA-approved spina bifida warnings accompanying Depakote at any relevant time, whether different warnings would have produced a different outcome in this case, and whether Emily was exposed to Depakote at a time and at a dosage that her spina bifida occurred as an alleged result, jurors are entitled to know this information.

Plaintiffs' effort to deprive the jury of all evidence relating to Mrs. Dotegowski's knowledge of Depakote is particularly problematic in the context of this case.  Dr. Kaplan's records related to the care that he might have provided to her in 1997-98 were destroyed before Plaintiffs filed suit and before they could be collected.  (*See* Ex. 11, 4/12/14 E. Kaplan Dep. at 12:2-24.)  Dr. Kaplan himself has no recollection of prescribing Depakote to Mrs. Dotegowski.  (*See id*. at 76:25-77:3.)  Accordingly, the jury in this case will be asked to resolve a hypothetical scenario—whether a different warning would have produced a different result—without the benefit of the prescribing physician's medical records; without knowing exactly what was communicated between Dr. Kaplan and Mrs. Dotegowski; without knowing the true severity of the psychiatric disease manifesting while he provided treatment to her; and without Dr. Kaplan having any knowledge of his prescribing decisions for Mrs. Dotegowski.  It is thus particularly important that evidence bearing on disputed causation issues be admitted so that the jury can resolve those disputes.

Unlike the California limitations trial, Plaintiffs might now argue that Mrs. Dotegowski was not warned about the birth defect risks of Depakote before Emily's spina bifida occurred and

that there is no reason to admit evidence of her purported lack of knowledge.  Either way, this evidence is relevant and permissible to resolve genuinely disputed, material issues.

If Plaintiffs continue to acknowledge that Mrs. Dotegowski was warned, that knowledge reflects the adequacy of the FDA-approved spina bifida warnings accompanying Depakote in 1997-98 and undermines Plaintiffs' theory that different warnings would have prevented their damages.   By 1998, Dr. Kaplan knew that Black Box Warnings are intended to convey significant information regarding the very serious, potentially lethal dangers, associated with Depakote.  (*Id*. at 79:20-25.)  Those potential risks include those of spina bifida—one of the birth defects about which Abbott explicitly warned in the 1998 Depakote Label.  (*Id*. at 80:1-81:3, 81:11-20; *see also id.* at 82:1-7 ("[If he] prescribed Depakote to Mrs. Dotegowski, [he] did so knowing that Depakote can, in fact, in certain circumstances, cause spina bifida.").)

That acknowledgement also would undermine Plaintiffs' claim that different warnings would have prevented their damages.  Dr. Kaplan has testified that, in 1997-98, he would have discussed the options and risks associated with Depakote with his patients, as well as the benefits of the available medications at the time; any subsequent decision to prescribe Depakote to Mrs. Dotegowski would have been made jointly with the patient.  (*Id*. at 83:24-84:2.)  For patients of childbearing age in 1997-98, that discussion with Dr. Kaplan would have included the potential for Depakote to cause birth defects, like spina bifida.  (*Id*. at 84:15-23.)  Such evidence that (1) Dr. Kaplan knew and warned Mrs. Dotegowski about the serious birth defect risks of Depakote and (2) in 1997-98, they purportedly made the joint decision for Mrs. Dotegowski to take Depakote for her bipolar disorder, is relevant to whether the different warnings that Plaintiffs' attorneys advocate would have prevented Plaintiffs' damages—a critical issue in this case.  *Cf. Scrofani v. Stihl Inc.*, 44 F. App'x 559, 563 (3d Cir. 2002) (applying New Jersey law) (affirming

dismissal of plaintiff's inadequate warning claim where "plaintiffs submitted no evidence indicating that a different warning would have prevented this accident"); *Coffman v. Keene Corp.*, 628 A.2d 710, 716 (N.J. 1993) ("plaintiff is required to prove that the absence of a warning was a proximate cause of his harm"); *Sharpe v. Bestop, Inc.*, 713 A.2d 1079, 1083 (N.J. Super. Ct. App. Div. 1998) ("plaintiff has the burden of proving . . . that the failure to warn was a proximate cause of plaintiff's injuries"), *aff'd*, 730 A.2d 285 (N.J. 1999).  If the serious warnings that Dr. Kaplan would have passed along to Mrs. Dotegowski in 1997 did not dissuade her from using Depakote, the jury would be well within in its province to find that different warnings would have made no difference.

Even if Plaintiffs now wish to stress Mrs. Dotegowski's original deposition testimony that Dr. Kaplan did not warn her about any birth defect risks (in contravention of his practice at the time) and Mrs. Dotegowski did not receive written warnings about Depakote (warnings that Dr. Kaplan recalls being included with Depakote samples during the relevant time period), that evidence would tend to show that Mrs. Dotegowski did not take Depakote samples during the critical time of her pregnancy with Emily.  A jury could reasonably find that, if Mrs. Dotegowski was not warned about the birth defect risks of Depakote before Emily's spina bifida occurred, her lack of knowledge resulted from her not being prescribed or taking Depakote samples at all.

Plaintiffs' liability theories also invite the type of evidence that they now seek to exclude.  Plaintiffs' allegations put Mrs. Dotegowski right in the middle of the prescribing decision that allegedly resulted in Emily's prenatal Depakote exposure.  (*See* Ex. 3, 8/23/12 M. Dotegowski Dep. at 228:10-20 (purportedly would not have taken Depakote if Dr. Kaplan had told her that, "if you ever got pregnant, this would definitely harm your baby"); *see also* Ex. 11, 4/12/14 Kaplan Dep. at 83:24-84:2 (testifying that any decision to prescribe would have been made

jointly with Mrs. Dotegowski).)   Since, according to Plaintiffs, the information that Mrs. Dotegowski *did not* know about the birth defect risks of Depakote is key to their efforts to prove proximate causation, the information that she *did* know may be used to defend against those theories.

The fact that New Jersey has adopted the learned intermediary doctrine does not diminish the admissibility of this evidence.   That doctrine applied in *Kaleta*, *Rheinfrank*, *Forbes*, and *Schmidt*, and every one of those courts (including this one) admitted evidence of the mother plaintiffs' knowledge of the birth defect risks of Depakote before their children were conceived. (*See, e.g.,* Ex. 43, 3/20/15 *Kaleta* Trial Tr. at 3124:14-20; Ex. 44, 10/27/15 *Rheinfrank* Trial Tr. at 261:9-263:8, 269:20-270:2, 273:24-274:11; Ex. 45, *Schmidt* Jury Instruction No. 8; Ex. 46, 5/31/16 *Forbes* Trial Tr. at 22:13-23:3.)

Plaintiffs also raise the specter of unfair prejudice, arguing that evidence of what Mrs. Dotegowski knew might cause the jury "to place blame on Mrs. Dotegowski for taking Depakote and becoming pregnant or be confused or misled as to the actual warnings issues in this case (i.e., whether Abbott's warnings to physicians were inadequate) on which it will be charged at the conclusion of evidence."   (*See supra* at 56).   Plaintiffs point to nothing to suggest that any jury in this case—much like the *Kaleta* jury—could not follow an instruction such as:

> The drug involved in this case, Depakote, can only be obtained with a prescription from a physician.   For this reason, Abbott has a duty to adequately warn and instruct only Mrs. Kaleta's prescribing physicians of the dangers of which it knew, or in the exercise of ordinary care, should have known, at the time Depakote was prescribed to Mrs. Kaleta.   Abbott had no duty to warn Mrs. Kaleta directly.

(Ex. 43, 3/20/15 *Kaleta* Trial Tr. at 3124:14-20.)

Plaintiffs want to prevent the jury from knowing what Mrs. Dotegowski had been told about the medicine she was taking, and, more importantly, how that knowledge affected her, as

well as Dr. Kaplan's, actions.  The jury should not be left in the dark, as Plaintiffs desire.  The Court should deny Plaintiffs' Motion.

**Plaintiffs' MIL #8**

Plaintiffs move to exclude any comment, evidence, testimony, argument,  inference  or documents  (hereinafter "evidence") that relates to Maryann Dotegowski's sexual history, incluing her use of contraception and relationship with her husband. Details of Maryann Dotegowski's history are not at issue and "any probative value of it is far outweighed by the prejudice to the plaintiff by creating an image of a sexually promiscuous woman." *In re Yasmin & Yaz (Drospirenone) Mktg, Sales Practices & PMF Prods. Liab. Litig*, No. 3:09-MD-02100, 2011 WL 6740391, at *18 (S.D. Ill. Dec. 22, 2011) (Herndon, J.) (granting plaintiff's motion *in limine* regarding same, except to the extent that it involved the plaintiff's use and experience of contraceptives). Judge Yandle recently deemed such information irrelevant in the *Bartolini* case, holding that "Stacy Bartolini's sexual history is irrelevant to the claims and defenses in this case." *Bartolini* MIL Order at *4. This evidence should similarly be excluded under FED. R. EVID. 401 and FED. R. EVID. 403.

**Abbott's Response to MIL #8**

Although Abbott acknowledges Judge Yandle's ruling, the facts and circumstances of this case are readily distinguishable from those in *Bartolini*.  The Court should deny Plaintiffs' Motion, because evidence, testimony, argument, and other references bear on disputed proximate causation and medical causation issues.

### A.  References to Mrs. Dotegowski's marital problems in 1997-98 are critical to this case.

In the fall of 1997, Mrs. Dotegowski was suffering from a significant amount of stress. (*See, e.g.,* Ex. 47, 6/2/14 Ticknor Rpt. at 3-5 (describing Mrs. Dotegowski's mental health

history).)  Her purportedly abusive mother lived with her and her family.  (*Id*.)  Mrs. Dotegowski had to care for her three children, all of whom were under the age of seven at the time.  (*Id.* at 5.)  Her marriage was suffering as an alleged result of her husband's gambling.  (*See, e.g.,* Ex. 3, 8/23/12 M. Dotegowski Dep. at 102:12-16, 103:9-23.)  Because of these conflicts "between her, her husband, children, and her mother," Mrs. Dotegowski was admitted to the Hampton Behavioral Health Center in September of 1997.  (*E.g.,* Ex. 47, 6/2/14 Ticknor Rpt. at 5.)  After her discharge, Mrs. Dotegowski and her husband continued to "hav[e] serious marital problems," and, as such, they "were not having relations."  (Ex. 3, 8/23/12 M. Dotegowski Dep. at 47:18-23.)  Because Mrs. Dotegowski was then abstinent, she did not think that she could become pregnant during the time period that she saw Dr. Kaplan.  (*Id.* at 47:15-23.)  In fact, Mrs. Dotegowski has testified that her husband and she had relations only one time between December 1997 and May 1998, and it resulted in Emily's conception.  (*Id.* at 48:16-49:9.)

In light of these facts, Mrs. Dotegowski's marital problems bear on several causation issues that the jury might have to resolve in this case.  <u>*First*</u>, Mrs. Dotegowski's tumultuous relationship with her husband reflects the seriousness of her medical condition and, therefore, her need for a medication like Depakote.  Dr. Kaplan has testified that, if he prescribed Depakote in 1997 and 1998 for Mrs. Dotegowski, it would have been to treat her bipolar disorder and that he had a significant concern about her risk of suicide.  (Ex. 11, 4/12/14 Kaplan Dep. at 87:14-17, 88:21-89:1.)  Prior to her hospitalization in September 1997, Mrs. Dotegowski expressed a desire to "take her children with her if [she] decided to drive and crash [her] car—but [her] friend came and she asked her to take [the] kids."  (Ex. 48, 9/10/97 Hampton Health Med. Rec.)  As one of the stressors that lead to her hospitalization was the "conflicts between her" and "her husband,"

this evidence is relevant to demonstrate the severity of her condition at the time Dr. Kaplan allegedly prescribed Depakote to Mrs. Dotegowski.  (Ex. 47, 6/2/14 Ticknor Rpt. at 5.)

_Second_, Mrs. Dotegowski's sexual history is probative of Dr. Kaplan's risk/benefit analysis when he allegedly prescribed Depakote to Mrs. Dotegowski.  Mrs. Dotegowski has testified that she did not believe that she could become pregnant while she was under Dr. Kaplan's care because she was not having relations with her husband.  (Ex. 3, 8/23/12 M. Dotegowski Dep. at 47:15-23.)  Despite Mrs. Dotegowski's contentions otherwise, it would be reasonable to infer that this information was shared with Dr. Kaplan, her psychiatrist. (_Id._ at 52:12-20.)[22]  Further, Dr. Kaplan might have decided to prescribe Depakote over the other possible alternative medications, Lithium and Tegretol, because she was abstinent.  As Dr. Kaplan, understandably, has "no personal knowledge of actually prescribing Depakote for Ms. Dotegowski" in 1997, this evidence is helpful to fill in the gaps regarding his risk/benefit analysis and ultimate prescribing decision.  (Ex. 11, 4/12/14 Kaplan Dep. at 76:25-77:3.)

_Third_, this evidence is relevant to medical causation.  The fact that Mrs. Dotegowski and her husband were suffering "serious marital problems" relates to Mrs. Dotegowski's amount of stress following Emily's conception.   (Ex. 3, 8/23/12 M. Dotegowski Dep. at 47:18-23.) Maternal stress has been identified as increasing the risk of spina bifida. (Ex. 27, 6/2/14 Graham Rpt. at 13-14, ¶ 30.)  As the report of a defense expert, Dr. John Graham, provides:

> In light of the many other risk factors for the occurrence of spina bifida in Ms. Dotegowski's pregnancy with Emily—_e.g._, family history of NTD, maternal obesity, lack of early gestational use of folic acid and multivitamin supplements,

---

[22] Plaintiffs' counsel seemed to intimate as much during his opening statement during the California mini-trial.  (_See_ Ex. 21, 8/18/15 _Dotegowski_ SOL Trial. Tr. at 74:15-20 ("Now, one thing you will learn in this case is that Maryann at the time was 39 years old. She and her husband's relationship was – I'll use the word rocky.  I will let her describe it.  But for various reasons, Maryann didn't think she could get pregnant, and I think Dr. Kaplan knew that patient pretty well.").)

> gestational diabetes, potential opioid exposure, **and significant maternal stress**—Emily likely would have been born with spina bifida even if her mother did take a low dose of [Depakote] (up to 750 mg/day) at some point in her pregnancy.

(Ex. 27, 6/2/14 Graham Rpt. at 29, ¶ 56.)  Consequently, Mrs. Dotegowski's maternal stress could have been a causal factor in Emily's spina bifida.  If nothing else, jurors should be able to consider the potential contributions of stress in considering the opinion of Plaintiffs' specific causation expert, Dr. Bodamer that Depakote caused Emily's spina bifida.

 *Finally*, Plaintiffs' concerns about unfair prejudice are unwarranted.  Abbott has no desire to "creat[e] an image" that Mrs. Dotegowski is "a sexually promiscuous woman."  *In re Yasmin & Yaz (Drospirenone) Mktg, Sales Practices & PMF Prods. Liab. Litig*, 2011 WL 6740391, at *18 (S.D. Ill. Dec. 22, 2011), and Plaintiffs can point to nothing to suggest that Abbott would.

  **B.** **If Plaintiffs' Motion is intended to challenge matters other than Mrs. Dotegowski's relationship with her husband, it also should be denied.**

 Plaintiffs never made clear what, if any, other evidence, testimony, argument, and references they intend to challenge with their Motion.  They could be seeking exclusion of all evidence related to Emily's conception, Mrs. Dotegowski's sexual activity during the time that she was allegedly taking potentially teratogenic prescription medicines, and/or the measures that Mrs. Dotegowski took to prevent pregnancy—topics that are plainly relevant and evidence that is plainly admissible.  Indeed, analogous evidence was admissible in the *Yasmin* case Plaintiffs cite.  *See In re Yasmin & Yaz*, 2011 WL 6740391, at *18 ("Clearly the plaintiff's history with contraceptives is relevant and . . . in particular any problems she has experienced with them.").

 Whatever the scope, Plaintiffs' Motion should be denied, particularly to the extent, if any, that it seeks to exclude evidence, testimony, or argument about:

- Birth defect warnings and information provided to Mrs. Dotegowski.  This evidence, testimony, and argument are relevant to proximate causation issues and the adequacy of Abbott's warning, as discussed *supra* 58-64.

- Information that Mrs. Dotegowski provided to Dr. Kaplan about whether she was sexually active and/or used contraception.  That evidence also bears on disputed proximate causation issues.

- Information about Mrs. Dotegowski's sexual activity and beliefs about her chances of becoming pregnant immediately before her pregnancy with Emily and until at least her discovery of Emily's spina bifida.  As discussed *supra*, such evidence is similarly critical to resolving disputed causation issues in this case.

Plaintiffs also have no legitimate reason to prevent the jury from considering otherwise admissible medical records simply because they might reference Mrs. Dotegowski's sexual history or may reflect information about her sexual history.

## Plaintiff's MIL #9

Plaintiffs move to exclude any evidence, argument, and testimony that Maryann Dotegowski's prescribing physician, Dr. Kaplan, was somehow negligent in prescribing Depakote to Stacy Bartolini.  Abbott should be precluded from doing so because it has presented no evidence to show that the treatment by Dr. Kaplan fell below the applicable standard of care. Such allegations are misleading and would serve only to confuse and prejudice the jury. FED. R. EVID. 403.

## Abbott's Response to Plaintiff's MIL #9

It is unclear what relief Plaintiffs request.  If Plaintiffs seek Abbott's position about whether the jury should determine whether Dr. Kaplan was negligent in the care and treatment that he provided to Mrs. Dotegowski in 1997-98 and whether any such negligence affects Abbott's potential liability or any damages in this case, that request is premature.

Based on the current record, Abbott does not intend to seek a jury finding that Dr. Kaplan was negligent.  Plaintiffs have not ruled out the possibility, however, that Dr. Kaplan will travel

to East St. Louis to testify live during trial.  If Dr. Kaplan's live testimony, if any, materially matches his deposition testimony, Abbott likely will not seek a jury finding that he was negligent.

If Dr. Kaplan's live testimony were to materially differ from his deposition testimony, Abbott reserves the right to approach the Court and argue that the jury should assess Dr. Kaplan's negligence, if any, as part of its liability or damages determinations in this case.  Dr. Kaplan's live testimony, if any, might warrant the jury considering whether (1) his actions and/or inaction are an intervening cause of Emily's spina bifida such that Abbott is not liable for Plaintiffs' alleged damages[23] and/or (2) those actions and/or inaction might provide grounds for apportionment of any damages awarded.[24]

If Plaintiffs seek to limit Abbott's ability to challenge Mrs. Dotegowski's deposition testimony that Dr. Kaplan (1) told her nothing about the potential birth defect risk of Depakote and/or (2) did not ask about her ability to become pregnant before and while she was allegedly taking Depakote, that Motion should be denied, because such evidence goes to disputed causation issues.  (*See, e.g.,* Ex. 3, 8/23/12 M. Dotegowski Dep. at 46:5-11 (Dr. Kaplan never disclosed reported 1-2% spina bifida risk); Ex. 49, 3/23/11 Pls.' Resp. to Abbott's Sp. Interrog. No. 4 at 3:27-28, 4:4 ("I was never warned not to become pregnant.").)

As recognized by Judge Karnow when he denied a substantially similar motion while Plaintiffs' claims were pending in California, Abbott "has the right to use evidence to show that plaintiff's injuries would have occurred regardless of an improved label."  (Ex. 10, *Dotegowski*

---

[23] *See, e.g., Perez v. Wyeth Labs. Inc.,* 734 A.2d 1245, 1262-63 (N.J. 1999); *cf. Baker v. App Pharm. LLP* 2012 WL 3598841, at *9 (D.N.J. 2012).

[24] *See, e.g., Town of Kearny v. Brandt,* 67 A.3d 601, 619; *Dafler v. Raymark Indus.,* 611 A.2d 136, 144 (N.J. Super. App. Div. 1992), *aff'd* 622 A.2d 1305 (N.J. 1993); *Cockerline v. Menendez*, 998 A.2d 575, 589 (N.J. Super. App. Div. 2010).

MIL Order, at 20-21.)  By the 1997-98 period critical to this case, Dr. Kaplan knew, among other things, about the birth defect risks disclosed in the Black Box Warning in the Depakote Label, that Black Box Warnings convey risks of potentially lethal conditions, that Depakote could cause spina bifida, and that Tegretol and lithium were alternative treatments for bipolar disorder.[25]  If that information was purportedly insufficient to lead Dr. Kaplan to warn Mrs. Dotegowski about the birth defect risks of Depakote and/or have her take measures to avoid becoming pregnant while taking Depakote, jurors would be well within their province to find that the different birth defect warnings that Plaintiffs advocate also would have made no difference in this case.

If Plaintiffs are challenging the permissibility of evidence, testimony, argument, and references regarding what Dr. Kaplan knew about the risks associated with Depakote in 1997-98 and what he would have instructed Mrs. Dotegowski if he prescribed that medicine for her bipolar disorder posing a suicide risk, the Court should deny that argument.  Such references are relevant, permissible, and critical to a fair trial in this case, regardless of whether Dr. Kaplan acted negligently.  In separate Depakote products liability cases, this Court and four other courts have rejected the relief that Plaintiffs seek with their Motion:

- *Kaleta*: The court refused to exclude "factual testimony about what Plaintiffs' mother['s] doctors knew or did not know about the risks of Depakote, the actions and decisions they did or did not take regarding same, and the advice relating to the factual circumstances surrounding the use of Depakote prior to and during pregnancy."  (2/20/15 Memo. & Order, *Kaleta* (Doc. 287) at 6 n.7.)

- *Raquel*: This Court, ruling on a similar motion, excluded evidence that suggested that the physicians were negligent or at fault where Abbott had no intention to present such an

---

[25] (Ex. 11, 4/12/14 Kaplan Dep. at 54:24-55:3, 79:12-80:6, 80:22-82:7, 89:2-6, 90:7-11, 14.)  Dr. Kaplan's purported failure to relay even that information to Mrs. Dotegowski warrants consideration by the jury.  *See Banner v. Hoffmann-La Roche Inc.*, 891 A.2d 1229, 1240 (N.J. Super. App. Div. 2006) (analyzing whether plaintiff and prescribing physician were knowledgeable of birth defect risks associated with Accutane: "Courts have noted that 'no harm could have been caused by failure to warn of a risk already known.'") (quoting *Plummer v. Lederle Labs.*, 819 F.2d 349, 359 (2d Cir. 1987)).

argument, but allowed extensive testimony that the prescribers were aware of the teratogenicity of Depakote.  (*See, e.g.*, Ex. 50, 6/5/17 *Raquel* Trial Tr. at 1154:12-19 (testimony of Dr. Han, on questioning of Plaintiffs' counsel, acknowledging that he knew of risk of spina bifida).)

- *Forbes*: The court refused to exclude evidence of negligence or fault of the prescribing physician.  (Ex. 32, 5/19/16 *Forbes* Pretrial Conf. Tr. at 5:24-6:4.)

- *Rheinfrank*: The court admitted evidence that, a few months after the child plaintiff's birth, the prescribing physician first told the child plaintiff's mother that the birth defects at issue resulted from prenatal Depakote exposure.  (Ex. 41, 10/15/15 *Rheinfrank* Trial Tr. at 149:6-150:4.)

- *Schmidt*: The court admitted a medical record providing that a doctor discussed spina bifida risks of Depakote with the child plaintiff's birth mother before the child's conception.  (*See* Ex. 42, 5/21/15 *Schmidt* Trial Tr. at 1591:1-7.)

- *Dotegowski*: Albeit in the context of the California limitations trial, Judge Karnow also admitted Mrs. Dotegowski's testimony that, if Dr. Kaplan "said that he told" her about birth defect risks of Depakote, "then I would believe he told me." (Ex. 21, 8/18/15 *Dotegowski* SOL Trial Tr. at 172:13-20.)

Nothing about this case warrants a departure from these Depakote cases.

Furthermore, as discussed above, evidence concerning Dr. Kaplan's knowledge about the alleged birth defect risks of Depakote and his actions based on that knowledge is relevant to the issue of whether any allegedly inadequate warning was the proximate cause of plaintiffs' injuries. *See Coffman,* 628 A.2d at 716 ("plaintiff is required to prove that the absence of a warning was a proximate cause of his harm"); *Sharpe,* 713 A.2d at 1083 (same).  In evaluating whether any alleged inadequacies in product warnings caused a plaintiff's injuries, a jury is entitled to know what the prescribing physician knew about the alleged risk, what the patient was told by the prescriber about the risk, and other admissible information bearing on whether different product warnings would have made any difference to the circumstances allegedly resulting in a plaintiff's alleged damages.  In 1997-98, Dr. Kaplan knew that Depakote could cause birth defects such as neural tube defects. (Ex. 11, 4/12/14 Kaplan Dep. at 91:11-14.)  He was aware that the operative Depakote Label contained a Black Box Warning regarding

71

teratogenicity. (*Id*. at 79:16-19.)   He also knew that the Black Box Warning conveyed "significant information regarding a very serious and potentially lethal danger." (*Id*. at 79:20-25). While Plaintiffs might try to couch such evidence as proof of "negligence" or "fault," the Court should admit it as relevant to proximate causation issues.

Plaintiffs have no legitimate basis to urge the Court to exclude evidence of Dr. Kaplan's knowledge about the birth defect risks of Depakote and his actions based on that knowledge at any relevant time in this case.   Accordingly, the Court should deny this motion to the extent it seeks to preclude Abbott from presenting evidence, testimony, or argument regarding what Dr. Kaplan knew about the risks associated with Depakote and what he instructed Mrs. Dotegowski to do in regard to her use of Depakote.

## Plaintiffs' MIL #10

Plaintiffs move to exclude any comment, evidence, testimony, argument, inference  or documents  (hereinafter "evidence") regarding certain irrelevant and highly prejudicial details of Maryann Dotegowski's history, psychiatric condition and the manifestation of the like, specifically including the fact that she experienced suicidal ideations and experienced violent impulses. Plaintiffs anticipate that Abbott may seek to introduce evidence that Mrs. Dotegowski was experiencing thoughts of violent impulses toward her children in particular.  Those impulses and such detailed manifestations of her psychiatric condition have no relevance to the central issue in this case – whether Abbott provided an adequate Depakote warning – or to any other issue of consequence to the determination of this case. Specifically, Plaintiff seeks to exclude: [26]

- Any history and details of abuse suffered by Maryann Dotegowski as a child;

- Plaintiff's father's alleged gambling problems;

---

[26] These issues are discussed in the Expert Report of Christopher Ticknor, M.D., Abbott's expert.

- Maryann Dotegowski's alleged suicide attempts, suicidal thoughts or statements; or thoughts or statements relating to harming her children.   And also the manifestations of Mrs. Dotegowski's bipolar disorder such as hospitalizations, hallucinations, overdose attempts and the like.

It is undisputed that Maryann Dotegowski suffered from a psychiatric condition, for which she was prescribed Depakote.  This is relevant <u>only insofar</u> as it is the reason she saw the prescribing physician Dr. Kaplan and was prescribed Depakote.  Plaintiff has no objection to discussion of what condition or conditions she suffered – *e.g.*, that she had bipolar disorder or major depression.   Plaintiffs only seek to bar discussion of the particular details that are irrelevant, inflammatory and bear a substantial risk of prejudicing or confusing the jury, and to bar Abbott from turning this into a trial about Mrs. Dotegowski's psychiatric and personal history, something that is is clearly intent on doing absent being ordered otherwise. Judge Yandle recently excluded a host of similar information in the *Bartolini* case, holding that "[s]uch evidence is irrelevant and immaterial to the claims and defenses in this case and highly prejudicial." *Bartolini* MIL Order at *5.  The same order should apply here.

## Abbott's Response to Plaintiffs' MIL #10

Plaintiffs admit that evidence of Mrs. Dotegowski's psychiatric condition "is relevant … as it is the reason she saw" "Dr. Kaplan and was prescribed Depakote."  Plaintiffs also do not object "to discussion of what condition or conditions she suffered – e.g., that she had bipolar disorder or major depression."   The parties differ over the scope of the permissible evidence, testimony, arguments, and references to Mrs. Dotegowski's bipolar disorder—a condition that led her to consider suicide and/or parricide, was exacerbated by her living with a mother whom Mrs. Dotegowski considered to be abusive, was heightened by her husband's reported gambling addiction, and that would have been key to Dr. Kaplan's decision to prescribe Depakote, if he did at all.

73

In *Raquel,* the Court rejected the plaintiffs' attempts to avoid talking about the reasons why a child's mother might need to take Depakote during her childbearing years:

> Plaintiffs have clearly indicated . . . that they intend to challenge the appropriateness of the prescription decisions for Ms. Raquel.  It is also clear that Plaintiffs seek to argue that Ms. Raquel did not need to be on Depakote at all, as evidenced by her post-conception treatment regimen.  The unfortunate nature of Ms. Raquel's [bipolar] disorder necessarily means that the sensitive details of her symptoms, as they are manifest (assuming a cognizant expert adequately connects the conduct with her disorder), will be allowed in at trial.

(Memo. & Order, *Raquel*, No. 15-cv-702 (Doc. 268), at 5-6 (May 16, 2017) (citations omitted) (providing Abbott with "a small amount of latitude on these subjects" and instructing Abbott to "use great caution in developing questions"); *accord* Ex. 10, *Dotegowski* MIL Order, at 18-19 (ruling that, "[g]iven that plaintiff claims defendant should have instructed doctors to prescribe Depakote only if other, less dangerous drugs, were not effective, evidence that plaintiff was at risk of committing suicide or harming her children, and that she had been hospitalized for psychiatric conditions and treated by multiple doctors, is relevant to prove that Dr. Kaplan might have prescribed Depakote even if he had read the more extreme warning," but excluding evidence concerning Mrs. Dotegowski's purportedly abusive mother and Michael Dotegowski's gambling habit).)[27]

Plaintiffs have provided no reason for the Court to sanitize the jury's consideration of the information that informed Dr. Kaplan's prescribing decisions with regard to Mrs. Dotegowski's

---

[27] While Plaintiffs argue that Judge Yandle granted their motion in *Bartolini*, Abbott filed a motion to reconsider that remains pending.  (*See* No. 17-cv-1146 (Doc. 52).)  Furthermore, Judge Yandle excluded, for example, evidence that, if Stacy Bartolini was "not taking Depakote, she wanted to 'choke people,'" her "alleged history of self-harm," and her "alleged prior overdose on aspirin" as "irrelevant and immaterial to the claims and defenses in this case" and/or "highly prejudicial."  (No. 17-cv-1146, Order (Doc. 44) at 5.)  As discussed in the text, such evidence bears directly on whether Dr. Kaplan even prescribed Depakote for Mrs. Dotegowski: it is such risks that would have led him to consider prescribing Depakote for patients suffering from bipolar disorder in 1997-98.

treatment in 1997-98, the reasons why Dr. Kaplan and Mrs. Dotegowski allegedly choose

Depakote to treat her bipolar disorder in 1997-98, and information that directly affects whether

different birth defect warnings would have resulted in a different choice.  Where, as here, a

plaintiff's failure-to-warn claims are intertwined with her medical condition and the decision to

use a medication for that condition, courts routinely admit evidence of the plaintiff's medical

history, particularly with regard to her use of the treatment at issue.  *See, e.g.*, *Comes v. N.J.*

*Transit Rail Operations, Inc.*, 2011 WL 2305429, at *9 (N.J. Super. Ct. App. Div. May 6, 2011)

(evidence of plaintiff's prior drug use relevant to "complete plaintiff's medical history" and

assess plaintiff credibility); *Bridges v. Eastman Kodak Co.*, 850 F. Supp. 216, 223 (S.D.N.Y.

1994) (evidence of plaintiffs' psychological histories necessary and relevant to defendants'

ability to defend themselves).  If anything, the need for the types of evidence that Plaintiffs

challenge is even stronger in this case than it was in *Bartolini*: this evidence bears on whether

Mrs. Dotegowski took Depakote when Emily's spina bifida occurred or at all.

> **A.   Evidence of Mrs. Dotegowski's risk of harming herself, risk to others, and history of abuse relate to whether she took Depakote when Emily's spina bifida occurred and her need for treatment.**

Mrs. Dotegowski's risk of suicide and her threat to others bear on whether Dr. Kaplan

would have even used Depakote to treat her bipolar disorder in 1997-98.  In Dr. Kaplan's words:

> Q:   So, if you are prescribing Depakote to a patient like Mrs. Dotegowski, for bipolar, you have a, would it be fair to say, significant concern about the risk of suicide?
>
> A:   Yes.
>
> *    *    *    *    *
>
> Q:   So, if you had prescribed Depakote to Mrs. Dotegowski, in – sometime in '97 or '98, for bipolar, and based on her history, am I correct that you had a significant concern about her risk of suicide?
>
> A:   Yes.

75

         \*      \*      \*      \*      \*

Q:     If Mrs. Dotegowski had suggested to you that she was a threat to herself and to her children, would Depakote have been a medicine that you would have considered for using with Mrs. Dotegowski?

A:     Only if she were bipolar.

(Ex. 11, 4/12/14 Kaplan Dep. at 88:5-9, 88:21-89:1, 111:2-6; *see also, e.g.,* Ex. 3, 8/23/12 M. Dotegowski Dep. at 168:19-22, 169:2-5 (Mrs. Dotegowski acknowledging death wishes toward herself, her mother, and her husband in September 1997); Ex. 47, 6/2/14 Ticknor Rpt. at 10, ¶ 2 (expert psychiatrist identified by Abbott summarizing available medical information and setting forth his unchallenged expert opinions: "If, in fact, Dr. Kaplan had prescribed Depakote for Maryann Dotegowski in 1998, doing so was appropriate and met the standard of care for treating her symptoms of Bipolar disorder and potentially saving her life.").)

In 1997-98, Dr. Kaplan was well aware that Mrs. Dotegowski posed such risks of harm to herself and others.  He began treating her in February 1997, when she was hospitalized for pulmonary problems and a psychiatric consult was requested as part of her treatment.  (Ex. 11, 4/12/14 Kaplan Dep. 7:19-25, 9:21-10:7, 11:7-15; *see* Ex. 51, 2/27/97 Underwood-Mem. Hosp. Med. Rec. (Dr. Kaplan reporting that Mrs. Dotegowski's problems at that time included "husband's compulsive gambling," "turbulent relationship with mother," "marital problems, etc for past 1-2 years," "wanting to go to sleep and not awaken, 2 OD/suicidal gestures in 1996, ↓ coping" and his concluding that psychological factors were affecting Mrs. Dotegowski's physical condition).)

In September 1997, Mrs. Dotegowski was hospitalized at Hampton Behavioral Hospital for her psychiatric problems.  (Ex. 11, 4/12/14 Kaplan Dep. at 107:6-108:2.)  That hospitalization resulted from comments she made during one of her sessions with Dr. Kaplan, relayed to personnel at Hampton:

> he stated she needed hospitalization because she was a danger to herself and her children.  Her middle child – behavior problems "violent fits" is very oppositional.  Pt told children that she "was going with God" and who did they want to stay with – all of them wanted to go with her – she at that time intended to take them with her (yesterday).  No difficulties in marriage, has been in counseling.
>
> Yesterday wanted to take children with her if decided to drive and crash car but friend came and she asked her to take kids.
>
> Emotional abuse by mother – would write notes to pt that were very degrading, that she was not any good and would never be anything, would say very negative things.  Brother attempted to kill pt x2 for her reporting him for drugs.  He tried to strangle her, father broke it up, 2nd time he put a shotgun to her face.

(Ex. 48, 9/10/97 Hampton Health Med. Rec., Admission Department Assessment (emphasis added); *see id.* (reporting, among other things, Mrs. Dotegowski's reports of Mr. Dotegowski's "gambling addiction," resulting in "$40,000 in debt;" feeling "controlled by mother;" and feeling "worthless, hopeless/helpless"); *see also* Ex. 11, 4/12/14 Kaplan Dep. at 108:3-110:22 (testifying about assessment record, to which Dr. Kaplan also would have had access while acting as Mrs. Dotegowski's psychiatrist).)

Such evidence concerning Mrs. Dotegowski's potential harm to herself and others in 1997-98 is required for jurors to even conclude that Dr. Kaplan would have prescribed Depakote for Mrs. Dotegowski during her pregnancy with Emily.  (Ex. 52, 7/7/14 Ticknor Dep. at 44:11-45:7 (details show "how desperately important it was to prescribe medicines to stabilize her condition" in 1997-98).)  In 1997-98, Dr. Kaplan would not have prescribed Depakote for a patient like Mrs. Dotegowski unless she had bipolar disorder and posed a risk of suicide.  (Ex. 11, 4/12/14 Kaplan Dep. at 88:5-9, 88:21-89:1, 111:2-6.)  If a jury were to accept Plaintiffs' arguments that Dr. Kaplan prescribed Depakote for Mrs. Dotegowski in 1997-98—and for reasons discussed elsewhere, it should not—the jury also needs to know why he would do so.  Mrs. Dotegowski's unstable mental health, troublesome history, and/or potential risks were so compelling that Dr. Kaplan allegedly prescribed and Mrs. Dotegowski agreed to take Depakote,

notwithstanding a Black Box Warning concerning "potentially lethal, very dangerous side effects" such as spina bifida.  (Ex. 11, 4/12/14 Kaplan Dep. at 54:24-55:3, *see, e.g., id.* at 79:12-82:7 (Dr. Kaplan's confirming familiarity with warnings that Depakote could cause birth defects); *id.* at 84:15-85:9 (confirming that his standard practice was to warn about birth defect risks).)  Without an accurate picture of Mrs. Dotegowski's psychiatric condition in 1997-98 and the information that Dr. Kaplan knew about that condition in 1997-98, jurors cannot reasonably determine her need for Depakote at that time.   The fact that Mrs. Dotegowski, her children, and/or others may have died had her condition gone untreated or undertreated should not be ignored.

Evidence of Mrs. Dotegowski's risk, in 1997-98, of physically harming herself and others, as well as her history of abuse, additionally bears on any assessment of whether Abbott's alleged warning failures proximately caused Plaintiffs' damages.  Even if they were to receive the benefit of a heeding presumption—one that the New Jersey appellate courts have not recognized in cases like this one and the Court should not apply here[28]—Plaintiffs still have to prove that the "absence of a warning was a proximate cause" of Plaintiffs' damages.  *Green v. Ridge Tool Co.,* 2005 WL 3879583 at *6 (N.J. Super. App. Div. 2006) (citation omitted). Weighing against Plaintiffs' assertions that different warnings would have prevented their damages are the following considerations from Mrs. Dotegowski's psychological health history just before Emily was conceived and that Dr. Kaplan knew at that time:

- Mrs. Dotegowski had tried to commit suicide at least twice.

- She had been hospitalized for her psychiatric conditions.

---

[28] *See McDarby v. Merck & Co.*, 949 A.2d 223, 268 (N.J. Super. Ct. App. Div. 2008) ("direct evidence in the form of the deposition testimony of McDarby's treating physician existed, rendering use of a [heeding] presumption unnecessary.").

78

- She lived with her mother, whom Mrs. Dotegowski considered to be abusive.[29] That abuse was in addition to the years she dealt with a brother who had threatened and tried to kill her, at least twice.

- In that same house, Mrs. Dotegowski also lived with her husband and Emily's father, Michael Dotegowski, whom Mrs. Dotegowski considered to be a habitual gambler.[30]

- In that same house, Mrs. Dotegowski raised three children, all under the age of seven at the time. A September 10, 1997 record documents Mrs. Dotegowski's telling her children that she "'was going with God'" and her intent to "take them with her (yesterday)" as part of a possible suicide attempt. (Ex. 48, 9/10/97 Hampton Behavioral Health Med. Rec.)

- Multiple doctors had recorded that Mrs. Dotegowski suffered from and/or tried to treat her for anxiety, depression, feeling overwhelmed, and/or stress.

- Both purported alternatives to Depakote posed reported risks of birth defects; one (Tegretol) also posed a suicide risk and agranulocytosis; another (lithium) posed risks to those with certain cardiovascular histories and to those with gastrointestinal

---

[29] Judge Karnow excluded evidence about Mrs. Dotegowski's mother, because the "type of drug taken by" Mrs. Dotegowski "would not impact the behavior of her mother," and he considered this very specific type of evidence "distracting and prejudicial." (Ex. 10, *Dotegowski* MIL Order, at 18-19.) But, the problems that Mrs. Dotegowski had with her mother were well known to Dr. Kaplan when he allegedly prescribed Depakote for Mrs. Dotegowski in 1997-98, would have factored into any decision he made to prescribe Depakote for her during that time period, and should be considered by jurors attempting to sort out what Dr. Kaplan would have done differently, if anything, had he been provided different warnings. (*See* Ex. 3, 8/23/12 M. Dotegowski Dep. at 152:19-153:10 (acknowledging "[e]xtremely" "significant problems" with her mother during relevant time period, agreeing that mother was "very controlling," and describing problems associated with mother's illness); *id.* at 169:2-5 (admitting death wishes for her mother); *id.* at 282:22-283:23 (describing Mrs. Dotegowski's fragile state in October 1997 as resulting from, among other things, "[t]aking care of a very elderly mother who was very abusive to me").)

[30] For the same reasons that he excluded evidence about Mrs. Dotegowski's mother, Judge Karnow also ruled that evidence of Mr. Dotegowski's gambling would be excluded during any liability trial in California. (Ex. 10, *Dotegowski* MIL Order, at 18-19.) Barring that evidence, however, would inhibit jurors' appreciation of the health information that Dr. Kaplan would have factored into allegedly prescribing Depakote for Mrs. Dotegowski, would have factored into that same decision-making process if he had been provided different warnings, and the stressful circumstances that Mrs. Dotegowski needed to control with medication in 1997-98. (*See* Ex. 3, 8/23/12 M. Dotegowski Dep. at 103:9-23 (husband was gambling in 1997-98, which stressed Mrs. Dotegowski); *id.* 152:11-18 (was approximately $40,000 in debt by February 1997).) As also discussed in the text, Mr. Dotegowski's gambling also bears on Plaintiffs' claim that Mrs. Dotegowski was provided with months of free Depakote samples from December 1997 until the Spring of 1998.

problems, such as Mrs. Dotegowski.  (Ex. 47, 6/2/14 Ticknor Rpt. at 11, ¶¶ 6-7; Ex. 52, 7/7/14 Ticknor Dep. at 80:25-83:20.)

(*See generally* Ex. 47, 6/2/14 Ticknor Rpt. at 10-12, ¶¶ 1-9 (summarizing Mrs. Dotegowski's psychiatric history based on available evidence); Ex. 52, 7/7/14 Ticknor Dep. at 43:11-44:5 (information about Mrs. Dotegowski's psychiatric history significant to understand stresses in Mrs. Dotegowski's life: "[T]riggers such as shock, trauma, violence, deprivation, poverty can trigger manic episodes or trigger bipolar mood shifts").)

The jury should consider these circumstances in assessing whether different verbiage in the 1998 Depakote Label about spina bifida risks would have prevented Plaintiffs' damages.  As stated previously, Plaintiffs will ask jurors to answer a hypothetical question: If Dr. Kaplan had been provided different spina bifida warnings in 1997-98, would those warnings have prevented Plaintiffs' damages?  Any reasonable, informed answer to that question requires evidence about what Dr. Kaplan knew about Mrs. Dotegowski's mental health in 1997-98, what risks she posed to herself, what risks she posed to others, and whether those risks were so significant that prescribing a medicine accompanied by, among other things, a Black Box Warning about potentially lethal side effects was appropriate.  The lost records and faded memories resulting from Plaintiffs' delay in bringing their claims only increases the importance of jurors considering the critical evidence that does exist and the information that Dr. Kaplan did know about Mrs. Dotegowski's mental health before Emily's spina bifida occurred.  That Plaintiffs would prefer to erase this critical proximate causation evidence is no reason to conduct a trial during which the parties pretend as if it does not exist.

Plaintiffs have opened the door to this evidence even wider than it already is.  They claim that Abbott should have, but did not, warn Dr. Kaplan that Depakote was more teratogenic than Tegretol and lithium.  Mrs. Dotegowski's suicidal thoughts and ideations affected the medicines

that would be appropriate for her: "If you give a patient a 30-day supply of a therapeutic dose of Tegretol, it is almost always going to be fatal.  So that would not have been an acceptable choice for her."  (Ex. 52, 7/7/14 Ticknor Dep. at 82:21-83:4; *see also* Ex. 4, 4/23/14 M. Dotegowski Dep. at 54:12-17 (Dr. Kaplan reportedly and repeatedly gave her "[b]etween ten and 12" boxes of Depakote "[f]or my monthly supply.").  Plaintiffs' attempt to portray Tegretol as a less teratogenic, equally efficacious alternative to Depakote increases the importance of the jury considering the reasonableness of that purported alternative and its potential effect on Mrs. Dotegowski's suicide risk in 1998.

Plaintiffs even question Mrs. Dotegowski's need for Depakote, soliciting testimony that, even after she started taking other medicines in June 1998, her bipolar disorder remained under control.  (*See, e.g.,* Ex. 11, 4/12/14 Kaplan Dep. at 59:22-60:17; 61:1-7.[31])  After having questioned the efficacy of Depakote in treating bipolar disorder generally and Mrs. Dotegowski's condition specifically, Plaintiffs have no basis to block the jury's consideration of Mrs. Dotegowski's reported need for Depakote when Emily's spina bifida occurred.

**B.      The Court should admit evidence concerning Mr. Dotegowski's gambling addiction so that the jury can address Dr. Kaplan's prescribing decision, disputed proximate causation issues, and alternative causes for Emily's spina bifida.**

Mr. Dotegowski's gambling addiction contributed to Mrs. Dotegowski's need to treat her bipolar disorder in 1997-98.  This was information that Dr. Kaplan knew when he made his prescribing decisions as part of the care and treatment that he provided to Mrs. Dotegowski during that time period, and was one of the stressors that Dr. Kaplan had to consider in prescribing the appropriate medication(s) for Mrs. Dotegowski at that time.  That addiction also

---

[31] Other evidence contradicts Plaintiffs' suggestion that Mrs. Dotegowski's use of other medications has been without incident. (*See, e.g.,* Ex. 53, 9/21/99 Underwood Mem. Hosp. Rec. at 38-40 (documenting subsequent overdose).)

contributed to Mrs. Dotegowski's stress, which, in turn, increased the likelihood of Emily being born with spina bifida. (*See, e.g.,* Ex. 3, 8/23/12 M. Dotegowski Dep. at 103:9-23 (in 1997-98, Mr. Dotegowski's gambling caused "stress and problems" for her).)  According to an expert identified by Abbott, Dr. Graham, stress is one of the "most common maternal risk factors leading to congenital malformations" and is one of "the many other risk factors for the occurrence of spina bifida in Mrs. Dotegowski's pregnancy with Emily."  (Ex. 27, 6/2/14 Graham Rpt. at 13, ¶ 29 (citing supporting authorities); 28, ¶ 55.[32])

 Plaintiffs' assertions that Dr. Kaplan gave Depakote samples to Mrs. Dotegowski because she could not afford that medicine also warrant the admission of this evidence.  (*See* Ex. 4, 4/23/14 M. Dotegowski Dep. at 39:23-40:4 (Depakote "was an expensive medicine"); Ex. 54, 4/24/14 Michael Dotegowski Dep. at 41:25-42:4 (Dr. Kaplan was "offering it to her to save some money for us"); Ex. 39, 4/25/14 Winter Dep. at 65:5-18 ("The Depakote was more money.").  To the extent Plaintiffs rely on the purported expense of Depakote as a reason for Mrs. Dotegowski to receive samples, the jury should evaluate that claim with the benefit of evidence about Mr. Dotegowski's gambling.

---

[32] Dr. Graham has concluded that "the significant maternal stress Ms. Dotegowski was under has also been modestly associated with an increased risk of spina bifida (Carmichael, et al., 2007 (spina bifida OR 1.39, CI 1.00-1.94); Carmichael, et al., 2014 (NTD OR 1.5, CI 1.1-2.0)."  (Ex. 27, 6/2/14 Graham Rpt. at 31-32, ¶ 61.)

 Plaintiffs urge the Court to exclude evidence of stress as an alternative cause of Emily's injuries because Dr. Graham objectively acknowledged that stress is not necessarily a greater risk for birth defects than Depakote.  (*See* Ex. 33, 7/8/14 Graham Dep. at 125:18-126:16, 130:3-10.) The choice between a possibly greater potential, but potentially inapplicable, risk of birth defects (Depakote) and a modest, but well documented, one (stress) is well suited for any jury.  Mrs. Dotegowski's stress was even documented in one of the several medical records from the December 1997-June 1998 time period during which her purported Depakote use was not documented.  (Ex. 5, 1/13/98 Schwartz Med. Rec. at 273 (Mrs. Dotegowski was "taking the multi-medications by Dr. Kaplan for her stress related disorder including Zyprexa that just started yesterday.").)

**Plaintiffs' MIL #11**

Plaintiffs move to exclude any comment, evidence, testimony, argument, inference or document (hereinafter "evidence") regarding or relating to the financial condition of Plaintiff's family, including any reference to filing for bankruptcy or receipt of government benefits. The fact that Plaintiff's family has experienced financial difficulties is irrelevant to the central issues being resolved in this case. Any reference or discussion of such issues would only serve to prejudice, confuse, or otherwise mislead the jury.

**Abbott's Response to MIL #11**

It is Plaintiffs who have put their financial condition in 1997-98 at issue.  Plaintiffs claim that the family's financial condition resulted in Dr. Kaplan giving Mrs. Dotegowski samples of Depakote for months.  (*See* Ex. 4, 4/23/14 M. Dotegowski Dep. at 39:24-40:4 (testifying that Dr. Kaplan gave her Depakote samples because "he knew [she] could not afford [the medication]," "[i]t was an expensive medication," and "[w]e did not have the finances so he was providing [samples] to help me out").)  Judge Karnow admitted Mrs. Dotegowski's testimony about this issue during the California limitations trial.  (*See* Ex. 21, 8/18/15 *Dotegowski* SOL Trial Tr. at 153:10-15 (testifying that Dr. Kaplan provided her with samples of Depakote in December of 1997 because "he knew [she] couldn't afford medications really well").)

As part of the upcoming trial, that same testimony relates to whether Mrs. Dotegowski took Depakote when Emily's spina bifida occurred and in what dosage.  Of the 11 to 15 medications Mrs. Dotegowski was taking at that time, she claims that Dr. Kaplan only provided samples of one—Depakote.  (*See supra* 8-10.)  Mrs. Dotegowski's insurance coverage paid for all others.  (*See supra* 8.)  Particularly in light of Mrs. Dotegowski's testimony about the circumstances surrounding the Depakote samples she allegedly took and the lack of contemporaneous medical records supporting that testimony, the Court should allow evidence,

testimony, argument, and other references related to Mrs. Dotegowski's financial condition in 1997-98 so that the jury can properly evaluate Plaintiffs' claim that Mrs. Dotegowski took Depakote when Emily's spina bifida occurred and in a dosage that could cause that condition.

Furthermore, Mrs. Dotegowski acknowledged the stress that her financial condition put on her in the months leading up to Emily's conception and the formation of her spina bifida. (*See* Ex. 3, 8/23/12 M. Dotegowski Dep. at 103:9-23 (describing stress of "not having money to pay the bills" in 1998).) That stress bears on Mrs. Dotegowski's need for Depakote in 1997-98, the risk-benefit analysis by which Dr. Kaplan allegedly prescribed Depakote for her during that time period, and other disputed proximate causation issues. (*See supra* 81-82.) That stress also provides another factor for the jury to consider in deciding whether Depakote did or did not cause Emily's spina bifida. (*See supra* 82 (discussing expert opinion of Dr. Graham that stress increases the risk of having a child with spina bifida).)

### III.  CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court preclude Abbott from introducing evidence, argument, and testimony concerning or regarding each of the topics set forth above.

Date:  December 22, 2017                   Respectfully submitted,

                                By:   */s/ Christopher Cueto   (with consent)*
                                      Christopher Cueto
                                      Bar No.:  06192248
                                      Michael Gras
                                      Bar No.:  06303414

                                      LAW OFFICE OF CHRISTOPHER CUETO, LTD.
                                      7110 West Main Street
                                      Belleville, Illinois  62223
                                      Telephone:  (618) 277-1554
                                      Facsimile:  (618) 277-0962

John E. Williams, Jr.
John T. Boundas
Brian A. Abramson
Sejal K. Brahmbhatt
Margot G. Trevino
WILLIAMS KHERKHER HART BOUNDAS, LLP
8441 Gulf Freeway, Suite 600
Houston, Texas  77017-5051
Telephone:  (713) 230-2200
Facsimile:  (713) 643-6226

George Erick Rosemond
ROSEMOND LAW GROUP, PC
8441 Gulf Freeway, Suite 600
Houston, Texas  77017
Telephone:  (713) 230-2342
Facsimile:  (713) 649-3470

**ATTORNEYS FOR PLAINTIFFS**

and


By: */s/ Dan H. Ball*_____
Dan H. Ball
dhball@bryancave.com
Stefan A. Mallen
samallen@bryancave.com
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, MO 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

Paul F. Strain
pfstrain@venable.com
Stephen E. Marshall
semarshall@venable.com
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202
(410) 244-7400 (telephone)
(410) 244-7742 (facsimile)

*Attorneys for Defendant*
*Abbott Laboratories Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 22, 2017, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system on all counsel of record.

<u>*/s/ Dan H. Ball*</u>